# No. 23-30671

# In the United States Court of Appeals
# For the Fifth Circuit

IN RE: CLAUDE F. REYNAUD, III,
*Appellant*

On Appeal from United States District Court
for the Western District of Louisiana

## RECORD EXCERPTS OF APPELLANT

SUBMITTED BY:

SCOTT M. GALANTE
State Bar No. 26890
scott@galantelitigation.com
WILLIAM M. ROSS
State Bar No. 27064
billy@galantelitigation.com
THE GALANTE LITIGATION GROUP, LLC
816 Cadiz Street
New Orleans, LA 70115
(504) 203-5010 (office)
(504) 203-5011 (facsimile)
Counsel for Appellant

# TABLE OF CONTENTS

**TAB No.**                                                                    **ROA**

   1      Docket Sheet………………………………………………….ROA.1

   2      Notice of Appeal……………………………………..…ROA.691

   3      March 3, 2023 Memorandum Order……………………..ROA.13

   4      June 8, 2023 Order…………………………………….ROA.236

   5      July 7, 2023 Order…………………………………...ROA.270

   6      August 24, 2023 Ruling……………………………….ROA.471

   7      Pre-Hearing Memorandum with Exhibits………………ROA.279

   8      August 8, 2023 Hearing Transcript……………………..ROA.796

   9      Certificate of Service

# Tab 1

Jump to Docket Table

# U.S. District Court
## Western District of Louisiana (Monroe)
## CIVIL DOCKET FOR CASE #: 3:23-mc-00062-JDC
## Internal Use Only

In re: McClenny Moseley & Associates P L L C       Date Filed: 03/03/2023
Assigned to: Judge James D Cain, Jr
 Case in other court:  5CCA, 23-30670

                 5CCA, 23-30671

                 5CCA, 23-30692

Cause: No cause code entered

**In Re**

| | | |
|---|---|---|
| **McClenny Moseley & Associates P L L C** | represented by | **William Pennington Gibbens** |

Schonekas Evans et al
909 Poydras St Ste 1600
New Orleans, LA 70112
504-680-6050
Fax: 504-680-6051
Email: billy@semmlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cameron Sean Snowden**
Law Office of Cameron Snowden
2933 Myrtle Ave Ste 2900
Baton Rouge, LA 70806
256-454-3335
Email: snowden.cameron@gmail.com
*ATTORNEY TO BE NOTICED*

**Claude Favrot Reynaud , III**
Law Office of Claude F Reynaud III
9 Killdeer St
New Orleans, LA 70124
225-241-1804
Email: creynaud3@gmail.com
*ATTORNEY TO BE NOTICED*

**Grant P Gardiner**
Law Office of Bruce C Betzer
3129 Bore St
Metairie, LA 70001
504-300-9266
Email: GrantPGardinerPACER@gmail.com
*ATTORNEY TO BE NOTICED*

**Gwyneth A O'Neill**
Schonekas Evans et al
909 Poydras St Ste 1600
New Orleans, LA 70112
504-680-6050
Fax: 504-680-6051
Email: gwyneth@semmlaw.com
*ATTORNEY TO BE NOTICED*

**James McClenny**
Charger Law
380 Ridge Lake Scenic Dr
Montgomery, TX 77316
844-662-7552
Email: james@chargerlaw.com
*ATTORNEY TO BE NOTICED*

**John Moseley**
McClenny Moseley & Assoc (HOU)
1415 Louisiana St Ste 2900
Houston, TX 77002
844-662-7552
Email: zach@mma-pllc.com
*ATTORNEY TO BE NOTICED*

**R William Huye , III**
2106 Key West Cove
Austin, TX 78746
225-354-5107
Email: huyerw3@gmail.com
*ATTORNEY TO BE NOTICED*

**Respondent**

**Cameron S Snowden**                 represented by  **Melissa M Lessell**
Deutsch Kerrigan & Stiles (NO)
755 Magazine St
New Orleans, LA 70130-3672
504-593-0689
Fax: 504-566-4022
Email: mlessell@deutschkerrigan.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Beverly Aloisio DeLaune**
Deutsch Kerrigan & Stiles (NO)
755 Magazine St
New Orleans, LA 70130-3672
504-593-0759
Email: bdelaune@deutschkerrigan.com
*ATTORNEY TO BE NOTICED*

**Respondent**

**James M McClenny**

represented by **James McClenny**
Charger Law
380 Ridge Lake Scenic Dr
Montgomery, TX 77316
832-414-1843
Email: james@chargerlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Garrison Jordan**
Macaluso & Jordan
P O Box 2828
Hammond, LA 70404
985-345-5291
Fax: 985-345-5293
Email: jgj@chehardy.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elsbet Carroll Smith**
Chehardy Sherman et al (HAM)
111 N Oak St Ste 200
Hammond, LA 70401
985-269-7220
Fax: 985-269-7224
Email: ecs@chehardy.com
*ATTORNEY TO BE NOTICED*

**William N Macaluso**
Chehardy Sherman et al (HAM)
111 N Oak St Ste 200
Hammond, LA 70401
985-269-7220
Email: wmacaluso@chehardy.com
*ATTORNEY TO BE NOTICED*

**Respondent**

**Grant P Gardiner**

represented by **Kevin Richard Tully**
Christovich & Kearney (NO)
601 Poydras St Ste 2300
New Orleans, LA 70130
504-593-4237
Fax: 504-561-5743
Email: krtully@christovich.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Howard Carter Marshall**
Christovich & Kearney (NO)
601 Poydras St Ste 2300
New Orleans, LA 70130
504-593-4220
Fax: 504-561-5743

Email: hcmarshall@christovich.com
*ATTORNEY TO BE NOTICED*

**Respondent**

**Claude F Reynaud, III**                  represented by   **William M Ross**
Galante Litigation Group
816 Cadiz St
New Orleans, LA 70115
504-523-1580
Fax: 504-524-0069
Email: wmr@stanleyreuter.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Scott M Galante**
Galante Litigation Group
816 Cadiz St
New Orleans, LA 70115
504-203-5010
Email: scott@galantelitigation.com
*ATTORNEY TO BE NOTICED*

**Respondent**

**J Zachary Moseley**                      represented by   **John Moseley**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William Pennington Gibbens**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Gwyneth A O'Neill**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Movant**

**Equal Access Justice Fund L P**          represented by   **Thomas M Flanagan**
*TERMINATED: 09/19/2023*                                    Flanagan Partners
201 St Charles Ave Ste 3300
New Orleans, LA 70170
504-569-0235
Fax: 504-592-0251
Email: tflanagan@flanaganpartners.com
*LEAD ATTORNEY*

**Alixe Lydia Duplechain**
Flanagan Partners

201 St Charles Ave Ste 3300
New Orleans, LA 70170
504-569-0235
Email: aduplechain@flanaganpartners.com

**Andres Friedrich Holmgren**
Flanagan Partners
201 St Charles Ave Ste 3300
New Orleans, LA 70170
504-569-0235
Fax: 504-592-0251
Email: aholmgren@flanaganpartners.com

**Movant**

**E A J F E S Q Fund L P**            represented by   **Thomas M Flanagan**
*TERMINATED: 09/19/2023*                              (See above for address)
                                                      *LEAD ATTORNEY*

                                                      **Alixe Lydia Duplechain**
                                                      (See above for address)

                                                      **Andres Friedrich Holmgren**
                                                      (See above for address)

Email to Active Attorneys' Primary Addresses
Email to All Attorneys' Primary Addresses
Email to Casewide NEF Recipients

| Date Filed | # | Docket Text |
|------------|---|-------------|
| 03/03/2023 | 1 (p.13) | ORDER adopting attorney disciplinary action suspending MMA attorneys. Copy of order emailed to the attorney and the appropriate district and bankruptcy court personnel. Signed by Judge James D Cain, Jr on 3/3/2023. (crt,Mitchell, P) Modified on 6/16/2023 (Mitchell, P). (Additional attachment(s) added on 9/29/2023: # 1 (p.13) Exhibit A - Transcript of 10-20-22 hearings, # 2 (p.236) Exhibit B - Transcript from 12-13-22 hearings) (Stewart, T). (Entered: 06/08/2023), (QC'ed on 06/08/2023, by Mitchell , P) |
| 06/08/2023 | 2 (p.236) | ORDER adopting attorney disciplinary action extending suspensions for the following MMA attorneys: John Moseley, R. William Huye, III, Cameron S. Snowden, Claude F. Reynaud, III, Grant P. Gardiner and James McClenny. Copy of order emailed to the attorney and the appropriate district and bankruptcy court personnel. Signed by Judge Terry A Doughty on 6/8/2023. (crt,Mitchell, P) (Entered: 06/08/2023), (QC'ed on 06/08/2023, by Mitchell , P) |
| 06/08/2023 | | (Court only) ***Staff notes (non-public entry - for Court Staff only): Attorneys were emailed and also mailed the notices of this Order on 6/8/23. Mr. Moseley and Mr. McClenny were only mailed the notices since we did not have emails for them. (crt,Mitchell, P) (Entered: 06/08/2023), (QC'ed on 06/08/2023, by Mitchell , P) |
| 06/08/2023 | | (Court only) ***Miscellaneous Case Terminated. (crt,Mitchell, P) (Entered: 06/08/2023), (QC'ed on 06/08/2023, by Mitchell , P) |
| 06/15/2023 | | |

| | | |
|---|---|---|
| | 3 (p.238) | LETTER from James M. McClenny to Judge Terry A Doughty regarding 1 (p.13) Order Adopting Attorney Disciplinary Action, requesting a hearing. (crt,Mitchell, P) (Entered: 06/16/2023), (QC'ed on 06/16/2023, by Mitchell , P) |
| 06/16/2023 | | MOTION to Reopen/Reinstate Case by McClenny Moseley & Assoc P L L C.Motion Ripe Deadline set for 6/16/2023 due to hearings being set.(crt,Mitchell, P) (Entered: 06/16/2023), (QC'ed on 06/23/2023, by Miletello , A) |
| 06/16/2023 | | (Court only) ***Deadlines/Hearings terminated. Entered in error. (crt,Mitchell, P) (Entered: 06/16/2023) |
| 06/16/2023 | | (Court only) ***Motions terminated: MOTION to Reopen/Reinstate Case filed by McClenny Moseley & Assoc P L L C. Reason for termination: entered in error. (crt,Mitchell, P) (Entered: 06/16/2023) |
| 06/16/2023 | 5 (p.240) | ORDER: Hearing set for 7/25/2023 11:00 AM in Lake Charles, Courtroom 4 before Judge James D Cain Jr. Signed by Judge James D Cain, Jr on 6/16/2023. (crt,Alexander, E) Modified on 6/22/2023 to correct numbering. (Mitchell, P) (Entered: 06/16/2023) |
| 06/16/2023 | | (Court only) ***Staff notes (non-public entry - for Court Staff only): Mr. James McClenny noticed this day about the hearing by the email james@chargerlaw.com and also the address Charger Law, 380 Ridge Lake Scenic Dr., Montgomery, Tx 77316. (this was found in the letter he sent to the court) (crt,Mitchell, P) (Entered: 06/16/2023) |
| 06/16/2023 | 4 (p.239) | ORDER transferring this matter to the Honorable Judge James D. Cain, Jr., in the Lake Charles division re MOTION to Reopen/Reinstate Case filed by James M. McClenny. An Order setting the hearing will be issued forthwith. Signed by Judge Terry A Doughty on 6/16/2023. (crt,Mitchell, P) Modified on 6/22/2023 to correct numbering. (Mitchell, P) Modified on 6/22/2023 - these are out of order with the hearing set.(Mitchell, P) (Entered: 06/22/2023), (QC'ed on 06/16/2023, by Mitchell , P) |
| 06/21/2023 | 6 (p.241) | MOTION for Hearing by attorney Cameron S. Snowden re 2 (p.236) Order Adopting Attorney Disciplinary Action extending suspensions filed by attorney Melissa M. Lessell. Motion Ripe Deadline set for 6/22/2023. (crt,Mitchell, P) Modified on 6/22/2023 to add attorney representing Mr. Snowden. (Mitchell, P) (Entered: 06/22/2023), (QC'ed on 06/22/2023, by Mitchell , P) |
| 06/22/2023 | 7 (p.243) | ORDER granting referral of the 6 (p.241) Motion for Hearing to the Honorable James D. Cain, Jr., in the Lake Charles Division for a hearing. An Order setting the hearing will be issued forthwith. Signed by Judge Terry A Doughty on 6/22/2023. (crt,Mitchell, P) (Entered: 06/22/2023), (QC'ed on 06/22/2023, by Mitchell , P) |
| 06/22/2023 | 8 (p.244) | MOTION for Hearing re 2 (p.236) Order Adopting Attorney Disciplinary Action, by Grant P Gardiner. Motion Ripe Deadline set for 6/21/2023. (Attachments: # 1 (p.13) Sworn Statement)(crt,Mitchell, P) (Entered: 06/22/2023), (QC'ed on 06/22/2023, by Mitchell , P) |
| 06/22/2023 | 9 (p.260) | ORDER granting referral of the 8 (p.244) Motion for Hearing for Grant P. Gardiner to the Honorable Judge James D. Cain, Jr., in the Lake Charles Division for a hearing. Signed by Judge Terry A Doughty on 6/22/2023. (crt,Mitchell, P) (Entered: 06/22/2023), (QC'ed on 06/22/2023, by Mitchell , P) |
| 06/22/2023 | | |

| | 10 (p.261) | MOTION for Hearing re 2 (p.236) Order Adopting Attorney Disciplinary Action, by Claude F Reynaud, III. Motion Ripe Deadline set for 6/22/2023. (crt,Mitchell, P) (Entered: 06/22/2023), (QC'ed on 06/22/2023, by Mitchell , P) |
|---|---|---|
| 06/22/2023 | 11 (p.263) | ORDER granting and referring to Judge Cain 10 (p.261) Motion for Hearing for Claude F. Reynaud, III. Signed by Judge Terry A Doughty on 6/22/2023. (crt,Mitchell, P) (Entered: 06/22/2023), (QC'ed on 06/22/2023, by Mitchell , P) |
| 06/22/2023 | 12 (p.264) | MOTION for Hearing re 2 (p.236) Order Adopting Attorney Disciplinary Action, by J Zachary Moseley. Motion Ripe Deadline set for 6/22/2023. (crt,Mitchell, P) (Entered: 06/22/2023), (QC'ed on 06/22/2023, by Mitchell , P) |
| 06/22/2023 | 13 (p.265) | ORDER granting and referring to Judge Cain 12 (p.264) Motion for Hearing filed by J. Zachary Moseley. Signed by Judge Terry A Doughty on 6/22/2023. (crt,Mitchell, P) (Entered: 06/22/2023) |
| 06/22/2023 | 14 (p.266) | ORDER re 8 (p.244) MOTION for Hearing re 2 (p.236) Order Adopting Attorney Disciplinary Action, filed by Grant P Gardiner. Hearing set for 8/3/2023 11:00 AM in Lake Charles, Courtroom 4 before Judge James D Cain Jr. Signed by Judge James D Cain, Jr on 6/22/2023. (crt,Alexander, E) (Entered: 06/22/2023) |
| 06/22/2023 | 15 (p.267) | ORDER re 10 (p.261) MOTION for Hearing re 2 (p.236) Order Adopting Attorney Disciplinary Action, filed by Claude F Reynaud, III. Hearing set for 8/8/2023 01:30 PM in Lake Charles, Courtroom 4 before Judge James D Cain Jr. Signed by Judge James D Cain, Jr on 6/22/2023. (crt,Alexander, E) (Entered: 06/22/2023) |
| 06/22/2023 | 16 (p.268) | ORDER re 12 (p.264) MOTION for Hearing re 2 (p.236) Order Adopting Attorney Disciplinary Action, filed by J Zachary Moseley. Hearing set for 8/8/2023 02:30 PM in Lake Charles, Courtroom 4 before Judge James D Cain Jr. Signed by Judge James D Cain, Jr on 6/22/2023. (crt,Alexander, E) (Entered: 06/22/2023) |
| 06/22/2023 | 17 (p.269) | ORDER re 6 (p.241) MOTION for Hearing re 2 (p.236) Order Adopting Attorney Disciplinary Action, filed by Cameron Snowden. Hearing set for 8/8/2023 10:00 AM in Lake Charles, Courtroom 4 before Judge James D Cain Jr. Signed by Judge James D Cain, Jr on 6/22/2023. (crt,Whidden, C) (Entered: 06/23/2023) |
| 06/23/2023 | | (Court only) ***Staff notes (non-public entry - for Court Staff only): Notice was sent by email this day regarding the hearings to Gardiner and Moseley and to the attorneys representing Reynaud and Snowden. Notice was also mailed to the attorneys and the counsel of those with attorneys. (crt,Mitchell, P) (Entered: 06/23/2023) |
| 07/07/2023 | 18 (p.270) | ORDER that attorneys James McClenny, John Zachary Moseley, Cameron S. Snowden, Claude F. Reynaud III, and Grant P. Gardiner provide to the court on or before August 1, 2023 the documents listed in the attached Order. Signed by Judge James D Cain, Jr on 7/7/2023. (crt,Stewart, T) (Entered: 07/07/2023) |
| 07/13/2023 | 19 (p.273) | ORDER TO UNSEAL CASE. IT IS ORDERED that the seal over this case and all documents filed herein be LIFTED. Signed by Judge James D Cain, Jr on 7/13/2023. (crt,Alexander, E) (Entered: 07/13/2023), (QC'ed on 08/08/2023, by Miletello , A) |
| 07/21/2023 | 20 (p.274) | RESPONSE by Grant P Gardiner re 18 (p.270) Order. (crt,Alexander, E) (Entered: 07/21/2023), (QC'ed on 08/08/2023, by Miletello , A) |
| 07/25/2023 | 21 (p.702) | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings for MISCELLANEOUS HEARING held on 7/25/2023 before Judge James D Cain Jr. Court Reporter/Transcriber Cathleen E Marquardt, Telephone number (337)593-5223. |

| | | |
|---|---|---|
| | | Total pages: 13. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or the Court Reporter. Redaction Request due 8/18/2023. Redacted Transcript Deadline set for 8/28/2023. Release of Transcript Restriction set for 10/26/2023. (crt,Marquardt, C) (Entered: 07/25/2023), *(QC'ed on 08/08/2023, by Miletello , A)* |
| 07/25/2023 | 22 (p.278) | MINUTES for proceedings held before Judge James D Cain, Jr: MISCELLANEOUS HEARING held on 7/25/2023. The matter was taken under advisement. James M. McClenny is to provide the court with the requested documents within 21 days. (Court Reporter: Cathleen E Marquardt) (crt,Stewart, T) (Entered: 07/25/2023), *(QC'ed on 08/08/2023, by Miletello , A)* |
| 07/28/2023 | 23 (p.279) | PRETRIAL Memorandum by Claude F Reynaud, III. (Attachments: # 1 (p.13) Exhibit Email dated Sept 22, 2021, # 2 (p.236) Exhibit Affidavit of Melanie Farrell, # 3 (p.238) Exhibit Affidavit of Heather Melaas, # 4 (p.239) Exhibit LLC Filing of Reynaud Gardiner, LLC)(aty,Ross, William) (Entered: 07/28/2023), *(QC'ed on 07/31/2023, by Alexander , E)* |
| 08/01/2023 | 24 (p.317) | RESPONSE by Claude F Reynaud, III re 18 (p.270) Order. (aty,Ross, William) Modified docket text on 8/1/2023 (Miletello, A). (Entered: 08/01/2023), *(QC'ed on 08/01/2023, by Miletello , A)* |
| 08/01/2023 | 25 (p.323) | RESPONSE by Cameron S Snowden re 18 (p.270) Order. (Attachments: # 1 (p.13) Exhibit 1)(aty,Lessell, Melissa) Modified docket text on 8/1/2023 (Miletello, A). (Entered: 08/01/2023), *(QC'ed on 08/01/2023, by Miletello , A)* |
| 08/01/2023 | 26 (p.330) | RESPONSE *Pre-Hearing Brief* by Cameron S Snowden re 17 (p.269) Order. (aty,Lessell, Melissa) (Entered: 08/01/2023), *(QC'ed on 08/03/2023, by Alexander , E)* |
| 08/07/2023 | 27 (p.359) | RESPONSE by Grant P Gardiner *Verified PreHearing Memorandum*. (Attachments: # 1 (p.13) Exhibit 1-Sworn Statement, # 2 (p.236) Exhibit 2-Response to Order, # 3 (p.238) Exhibit 3-Notices)(aty,Tully, Kevin) (Entered: 08/07/2023), *(QC'ed on 08/07/2023, by Miletello , A)* |
| 08/08/2023 | 28 (p.454) | MINUTES for proceedings held before Judge James D Cain, Jr: MISCELLANEOUS HEARING held on 8/8/2023on 6 (p.241) MOTION for Hearing re 2 Order Adopting Attorney Disciplinary Action, by Grant P Gardiner. The matter was taken under advisement. (Court Reporter: DD Juranka) (crt,Stewart, T) (Entered: 08/08/2023), *(QC'ed on 08/24/2023, by Whitener , M)* |
| 08/08/2023 | 29 (p.878) | EXHIBIT LIST by Cameron S Snowden. (Attachments: # 1 (p.13) Snowden 1 - Sworn statement of Cameron Snowden, docket #22-cv-3396, WDLA, # 2 (p.236) Snowden 2 - Declaration of Cameron Snowden, docket #3:23-MC-62, # 3 (p.238) Snowden 3 - Docket sheet, 22-cv-3396, WDLA, showing payment of sanction on 8/2/23, # 4 (p.239) Snowden 4 - Affidavit of Melanie Farrell filed in 3:23-mc-62 as attachment 2 to document 23)(crt,Stewart, T) (Entered: 08/08/2023), *(QC'ed on 08/29/2023, by Miletello , A)* |
| 08/08/2023 | 30 (p.455) | MINUTES for proceedings held before Judge James D Cain, Jr: MISCELLANEOUS HEARING held on 8/8/2023 on 8 (p.244) MOTION for Hearing re 2 Order Adopting Attorney Disciplinary Action, by Grant P Gardiner. The matter was taken under advisement. (Court Reporter: DD Juranka) (crt,Stewart, T) (Entered: 08/08/2023), *(QC'ed on 08/29/2023, by Miletello , A)* |

| | | |
|---|---|---|
| 08/08/2023 | 31 (p.457) | MINUTES for proceedings held before Judge James D Cain, Jr: MISCELLANEOUS HEARING held on 8/8/2023 on 10 (p.261) MOTION for Hearing re 2 Order Adopting Attorney Disciplinary Action, by Claude F Reynaud, III. Counsel for the respondent adopts the legal portions of the briefs of the colleagues that were filed in the record, which was evidentiary or otherwise, as well as documents filed in the record by Mr. Reynaud. Counsel for Mr. Reynaud would also like the court to consider the two affidavits filed as attachments in document #23 in this matter. This matter was taken under advisement. (Court Reporter: DD Juranka) (crt,Stewart, T) (Entered: 08/08/2023), (QC'ed on 08/29/2023, by Miletello, A) |
| 08/08/2023 | 32 (p.458) | MINUTES for proceedings held before Judge James D Cain, Jr: MISCELLANEOUS HEARING held on 8/8/2023 on 12 (p.264) MOTION for Hearing re 2 Order Adopting Attorney Disciplinary Action, by J Zachary Moseley. A separate order will be prepared addressing Orders of the court as to Mr. Moseley. This matter was taken under advisement. (Court Reporter: DD Juranka) (crt,Stewart, T) (Entered: 08/08/2023), (QC'ed on 08/29/2023, by Miletello, A) |
| 08/08/2023 | 33 (p.459) | WITNESS LIST filed (restricted access) as to Miscellaneous hearings held on 8/8/23, documents 28, 30, 31, 32. (crt,Stewart, T) (Entered: 08/08/2023), (QC'ed on 08/29/2023, by Miletello, A) |
| 08/08/2023 | 34 (p.460) | ORDER re Miscellaneous Hearings held on 8/8/23 regarding the appeals of the temporary suspensions that were extended, of attorneys for the McClenny, Moseley & Associates law firm (MMA), namely, Cameron Snowden, Grant Gardiner, Claude Reynaud, III, and John Zach Moseley. IT IS ORDERED that within 7 days of the date of this Order, Mr. Moseley on behalf of the MMA law firm, move all monies/funds of all Louisiana clients to a Louisiana IOLTA trust account in the state of Louisiana, and registered with the Louisiana State Bar and Office of Disciplinary Counsel. IT IS FURTHER ORDERED that Mr. Moseley produce the complete detailed bank account statements of Veritex Community Bank (Account Number XXXXXX9407), beginning May of 2023 through the present, and Oakwood Community Bank, beginning September 2022 through May 2023, and copies of the 22 checks ($1,360,111.03) debited from the Veritex Community Bank checking account reflected on the 6/01/23 thru 7/02/23 bank statement no later than 7 days of this Order. IT IS FURTHER ORDERED that Mr. Moseley physically deliver possession of every original undeposited check for Hurricane claims for Louisiana clients to the Lake Charles Federal Courthouse no later than noon on Friday, August 11, 2023.(provided to the Court in Exhibits H1 and H2). IT IS FURTHER ORDERED that Mr. Moseley locate Aaron Sonniers $75,000 settlement funds, disburse those funds clear of any withholdings, and distribute the remaining portion to Mr. Sonnier no later than 14 days from the date of this Order. Mr. Moseley is to provide a written confirmation that the funds have been disbursed. Signed by Judge James D Cain, Jr on 8/8/2023. (crt,Stewart, T) (Entered: 08/08/2023), (QC'ed on 08/29/2023, by Miletello, A) |
| 08/08/2023 | | Set Deadlines: Deadline set for 8/11/2023, no later than noon for Mr. Moseley physically deliver possession of every original undeposited check for Hurricane claims for Louisiana clients to the Lake Charles. (crt,Stewart, T) (Entered: 08/08/2023), (QC'ed on 08/29/2023, by Miletello, A) |
| 08/11/2023 | 35 (p.716) | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings for Motion Hearing held on 8/8/2023 before Judge James D Cain Jr. Court Reporter/Transcriber DD Juranka, Telephone number (337)214-6669. Total pages: 162. Transcript may be viewed at the court public terminal or purchased through the Court |

| | | |
|---|---|---|
| | | Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or the Court Reporter. Redaction Request due 9/5/2023. Redacted Transcript Deadline set for 9/14/2023. Release of Transcript Restriction set for 11/13/2023. (crt,Juranka, D) (Entered: 08/11/2023), (QC'ed on 08/18/2023, by Alexander , E) |
| 08/22/2023 | 36 | ELECTRONIC MINUTE ENTRY issued by the Clerk. By direction of Chief Judge Terry A Doughty, this matter is hereby reassigned. Case reassigned to Judge James D Cain, Jr. Judge Terry A Doughty no longer assigned to case. All future filings should bear the name of the new judge assignment.(crt,Kiper, C) (Entered: 08/22/2023), (QC'ed on 08/29/2023, by Miletello , A) |
| 08/22/2023 | 37 (p.462) | ORDER regarding attorney fees, costs, expenses and proceeds of property interest/ownership. Signed by Judge James D Cain, Jr on 8/22/2023. (Attachments: # 1 (p.13) Exhibit A)(crt,Kiper, C) (Entered: 08/23/2023), (QC'ed on 08/29/2023, by Miletello , A) |
| 08/24/2023 | 38 (p.471) | RULING: IT IS ORDERED that the extended suspension from the practice of law as to Cameron S. Snowden is modified from 6 months to 4 months or until October 8, 2023 for the reasons stated. Signed by Judge James D Cain, Jr on 8/24/2023. (crt,Stewart, T) (Entered: 08/24/2023), (QC'ed on 08/29/2023, by Miletello , A) |
| 09/04/2023 | 39 (p.472) | MOTION to Intervene with consent sought but not yet obtained by Equal Access Justice Fund, LP, EAJF ESQ Fund LP. Motion Ripe Deadline set for 9/4/2023. (Attachments: # 1 (p.13) Proposed pleading, # 2 (p.236) Proposed exhibit A, # 3 (p.238) Proposed exhibit B, # 4 (p.239) Proposed exhibit C, # 5 (p.240) Proposed exhibit D, # 6 (p.241) Proposed exhibit E, # 7 (p.243) Proposed exhibit F, # 8 (p.244) Proposed exhibit G, # 9 (p.260) Proposed exhibit H, # 10 (p.261) Proposed order)(Attorney Thomas M Flanagan added to party Equal Access Justice Fund, LP(pty:intv), Attorney Thomas M Flanagan added to party EAJF ESQ Fund LP(pty:intv))(aty,Flanagan, Thomas) Modified on 9/8/2023 to modify motion event. (Crick, S). (Entered: 09/04/2023), (QC'ed on 09/08/2023, by Crick , S) |
| 09/04/2023 | 40 (p.672) | Ex Parte MOTION to Expedite consideration of 39 (p.472) MOTION for Leave to File Complaint in Intervention with consent sought but not yet obtained by EAJF ESQ Fund LP, Equal Access Justice Fund, LP. Motion Ripe Deadline set for 9/4/2023. (Attachments: # 1 (p.13) Proposed order)(aty,Flanagan, Thomas) (Entered: 09/04/2023), (QC'ed on 09/08/2023, by Crick , S) |
| 09/15/2023 | 41 (p.676) | Ex Parte MOTION for John Garrison Jordan; Elsbet Smith; William Macaluso to Enroll as Counsel by James M McClenny. Motion Ripe Deadline set for 9/15/2023. (Attachments: # 1 (p.13) Proposed order)(Attorney John Garrison Jordan added to party James M McClenny(pty:res))(aty,Jordan, John) (Entered: 09/15/2023), (QC'ed on 09/18/2023, by Miletello , A) |
| 09/18/2023 | 42 (p.679) | Ex Parte MOTION for Telephone Status Conference re 39 (p.472) Motion to Intervene by E A J F E S Q Fund L P, Equal Access Justice Fund L P. Motion Ripe Deadline set for 9/18/2023. (Attachments: # 1 (p.13) Proposed order)(aty,Flanagan, Thomas) Modified motion event on 9/19/2023 (Miletello, A). (Entered: 09/18/2023), (QC'ed on 09/19/2023, by Miletello , A) |
| 09/19/2023 | 43 (p.684) | ORDER denying 39 (p.472) Motion and Incorporated Memorandum in Support for Leave to Intervene; denying 40 (p.672) Motion to Expedite; denying 42 (p.679) Motion for Status Conference. Signed by Judge James D Cain, Jr on 9/19/2023. (crt,Whitener, M) (Entered: 09/20/2023), (QC'ed on 10/11/2023, by Whitener , M) |

| 09/20/2023 | 46 (p.690) | ORDER granting 41 (p.676) Motion to Enroll as Counsel. Added as counsel John Garrison Jordan,Elsbet Carroll Smith,William N Macaluso for James M McClenny. Signed by Judge James D Cain, Jr on 9/20/2023. (crt,Whitener, M) (Entered: 09/22/2023) |
|---|---|---|
| 09/21/2023 | 44 (p.686) | MOTION for William P. Gibbens and Gwyneth A. O'Neill to Enroll as Counsel by McClenny Moseley & Associates P L L C, J Zachary Moseley. Motion Ripe Deadline set for 9/21/2023. (Attachments: # 1 (p.13) Proposed order)(Attorney William Pennington Gibbens added to party McClenny Moseley & Associates P L L C(pty:inre), Attorney William Pennington Gibbens added to party J Zachary Moseley(pty:res))(aty,Gibbens, William) (Entered: 09/21/2023), (QC'ed on 09/21/2023, by Crick , S) |
| 09/21/2023 | 45 (p.688) | NOTICE OF APPEAL as to 37 (p.462) Order by McClenny Moseley & Associates P L L C, J Zachary Moseley. (Filing fee $505, receipt number ALAWDC-5699948) (aty,Gibbens, William) (Entered: 09/21/2023), (QC'ed on 09/21/2023, by WalkerSld , B) |
| 09/21/2023 | | NOTICE of Appeal Transcript Order Requirement regarding 45 (p.688) Notice of Appeal. Pursuant to FRAP 10(b), the Appellant must file the transcript order form regardless of whether transcripts are necessary. Access the 5th Circuit site by clicking here. Hover over the Forms Fees & Guides tab, Forms, Court Reporter Forms, Transcript Order Form.<br><br>In following the instructions on the form, please note manual notification to the court reporter and the 5th Circuit Court of Appeals is STILL REQUIRED. (crt,WalkerSld, B) (Entered: 09/21/2023) |
| 09/22/2023 | 47 (p.691) | NOTICE OF APPEAL as to 38 (p.471) Order, by Claude F Reynaud, III. (Filing fee $505, receipt number ALAWDC-5700994) (aty,Ross, William) (Entered: 09/22/2023), (QC'ed on 09/25/2023, by WalkerSld , B) |
| 09/22/2023 | | NOTICE of Appeal Transcript Order Requirement regarding 47 (p.691) Notice of Appeal. Pursuant to FRAP 10(b), the Appellant must file the transcript order form regardless of whether transcripts are necessary. Access the 5th Circuit site by clicking here. Hover over the Forms Fees & Guides tab, Forms, Court Reporter Forms, Transcript Order Form.<br><br>In following the instructions on the form, please note manual notification to the court reporter and the 5th Circuit Court of Appeals is STILL REQUIRED. (crt,WalkerSld, B) (Entered: 09/22/2023) |
| 09/25/2023 | 48 (p.693) | ORDER granting 44 (p.686) Motion to Enroll as Counsel. Added as counsel William Pennington Gibbens,Gwyneth A O'Neill for McClenny Moseley & Associates P L L C,William Pennington Gibbens,Gwyneth A O'Neill for J Zachary Moseley. Signed by Judge James D Cain, Jr on 9/22/2023. (crt,Whitener, M) (Entered: 09/25/2023) |
| 09/26/2023 | 49 (p.694) | ORDER re 34 (p.460) Order re Miscellaneous Hearings held on 8/8/23. Considering the record of misconduct established repeatedly in this court, including the repeated delays that resulted in the disbursement of Mr. Sonniers settlement funds, as established at the hearing held on August 8, 2023, the undersigned hereby AFFIRMS that neither Zach Moseley nor McClenny, Moseley & Associates PLLC is entitled to any withholding of attorney fees from the settlement check owed to Aaron Sonnier from his Hurricane Laura suit against Safeco Insurance Company. Signed by Judge James D Cain, Jr on 9/26/2023. (crt,Stewart, T) (Entered: 09/26/2023) |

| 09/27/2023 | | USCA Case Number 23-30670 for 45 (p.688) Notice of Appeal filed by McClenny Moseley & Associates P L L C, J Zachary Moseley. (crt,WalkerSld, B) (Entered: 09/27/2023) |
|---|---|---|
| 09/27/2023 | | USCA Case Number 23-30671 for 47 (p.691) Notice of Appeal filed by Claude F Reynaud, III. (crt,WalkerSld, B) (Entered: 09/27/2023) |
| 09/28/2023 | 50 (p.695) | NOTICE OF APPEAL as to 43 (p.684) Order on Motion to Intervene, Order on Motion to Expedite, Order on Motion for Hearing by E A J F E S Q Fund L P, Equal Access Justice Fund L P. (Filing fee $505, receipt number ALAWDC-5707433) (aty,Flanagan, Thomas) (Entered: 09/28/2023), (QC'ed on 09/28/2023, by WalkerSld , B) |
| 09/28/2023 | | NOTICE of Appeal Transcript Order Requirement regarding 50 (p.695) Notice of Appeal. Pursuant to FRAP 10(b), the Appellant must file the transcript order form regardless of whether transcripts are necessary. Access the 5th Circuit site by clicking here. Hover over the Forms Fees & Guides tab, Forms, Court Reporter Forms, Transcript Order Form. In following the instructions on the form, please note manual notification to the court reporter and the 5th Circuit Court of Appeals is STILL REQUIRED. (crt,WalkerSld, B) (Entered: 09/28/2023) |
| 10/03/2023 | 51 (p.697) | APPEAL TRANSCRIPT REQUEST by McClenny Moseley & Associates P L L C, J Zachary Moseley for Miscellaneous held on 10/20/22; 12/13/22; 8/8/23 before Judge James D Cain Jr. Court Reporter Deidre Juranka (aty,Gibbens, William) (Entered: 10/03/2023), (QC'ed on 10/03/2023, by WalkerSld , B) |
| 10/03/2023 | | USCA Case Number 23-30692 for 50 (p.695) Notice of Appeal, filed by Equal Access Justice Fund L P, E A J F E S Q Fund L P. (crt,WalkerSld, B) (Entered: 10/03/2023) |
| 10/03/2023 | 52 (p.698) | APPEAL TRANSCRIPT REQUEST by Claude F Reynaud, III for Misc Hearing - Motion for Hearing re 2 Order Adopting Attorney Disciplinary Action held on 08/08/2023 before Judge James D. Cain, Jr.. Court Reporter Deidre Juranka (aty,Galante, Scott) (Entered: 10/03/2023), (QC'ed on 10/03/2023, by WalkerSld , B) |
| 10/03/2023 | 53 (p.700) | APPEAL TRANSCRIPT REQUEST by McClenny Moseley & Associates P L L C, J Zachary Moseley for Miscellaneous held on July 25, 2023 before Judge James D Cain Jr. Court Reporter Cathleen Marquardt (aty,Gibbens, William) (Entered: 10/03/2023), (QC'ed on 10/03/2023, by WalkerSld , B) |
| 10/05/2023 | | Set Deadline for Clerk re 47 (p.691) Notice of Appeal: Certify Appeal Record (23-30671) by Clerk to COA 10/20/2023. (crt,WalkerSld, B) (Entered: 10/05/2023) |
| 10/06/2023 | 54 (p.701) | APPEAL TRANSCRIPT REQUEST by E A J F E S Q Fund L P, Equal Access Justice Fund L P before Judge James D Cain Jr. Transcript Not Required (aty,Flanagan, Thomas) (Entered: 10/06/2023), (QC'ed on 10/06/2023, by WalkerSld , B) |
| 10/10/2023 | | Set Deadline for Clerk re 50 (p.695) Notice of Appeal: Certify Appeal Record (23-30692) by Clerk to COA 10/25/2023. (crt,WalkerSld, B) (Entered: 10/11/2023) |

In re: McClenny Moseley & Associates P L L C (3:23-mc-00062-JDC)

Tab 2

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**

IN RE: ATTORNEYS OF MCCLENNY          §          CASE NO 3:23-MC-0062
MOSELEY & ASSOCIATES, PLLC            §
                                      §          JUDGE JAMES D. CAIN, JR.
                                      §
                                      §

---

### NOTICE OF APPEAL

---

**NOTICE IS HEREBY GIVEN**, through undersigned counsel, that Respondent Claude F.

Reynaud, III, appeals to the United States Court of Appeals for the Fifth Circuit from a final Ruling

entered in the captioned miscellaneous action on August 24, 2023 (District Court Record

Document No. 38), signed by the United States District Judge James D. Cain, Jr., for the Western

District of Louisiana, together with all prior orders and rulings which produced the August 24,

2023 Ruling.

This Notice of Appeal is for all purposes permitted by law and is timely filed pursuant to

Federal Rule of Appellate Procedure 4(a)(1)(A).

New Orleans, Louisiana, this 22nd day of September 2023.

Respectfully Submitted,

THE GALANTE LITIGATION GROUP, LLC

*/s/ William M. Ross*
WILLIAM M. ROSS (#27064)
SCOTT M. GALANTE, T.A. (#26890)
816 Cadiz Street
New Orleans, Louisiana 70115
Phone: 504-452-8347
scott@galantelitigation.com
billy@galantelitigation.com

*Attorneys for Claude F. Reynaud, III*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 22, 2023, I electronically filed the foregoing pleading

with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing

to all counsel of record.

> */s/William M. Ross*
> WILLIAM M. ROSS

Tab 3

# UNITED STATES DISTRICT COURT
## FOR THE
## WESTERN DISTRICT OF LOUISIANA

## IN RE: McCLENNY MOSELEY & ASSOCIATES PLLC

## <u>MEMORANDUM ORDER</u>

The undersigned has been concerned about the misconduct of attorneys from McClenny Moseley & Associates, PLLC ("MMA") in relation to their representation of clients with claims arising from Hurricanes Laura, Delta, and Ida since the mass filing of several hundred cases by that firm beginning in August 2022. Review of the cases raised several issues, including duplicate filings, cases filed against insurers who had no policy in place with the plaintiff, and cases filed on behalf of plaintiffs who had already settled their hurricane claims with the insurer. MMA attorneys were given the opportunity to address the concerns through hearings held on October 20 and December 13, 2022, as well as *in camera* submissions.

The hearings and submissions did little to assuage these concerns and instead raised new issues relating to client communication, the way MMA had been retained, and handling of settlement proceeds. *See* Exhibt A (Transcript, Hearing 1) and Exhibit B (Transcript, Hearing 2). Specifically, at the first hearing, the court expressed concern about efforts by MMA to mass-settle hurricane claims. Exh. A, pp. 22–26. It also heard testimony from several MMA clients, none of whom appeared to have adequately communicated with their attorneys before suit was filed. *Id.* at 30–47. At the second hearing, the court heard from MMA client Betty Green, who filed suit against State Farm despite previously settling

her claim with the insurer in a suit filed with a different plaintiff's attorney. Exh. B, pp. 25–32. MMA also inadvertently filed multiple lawsuits on her behalf. *Id.* The court heard testimony on MMA's use of an unlicensed "estimator" for establishing damages, rather than the licensed public adjusters relied on by plaintiffs in most cases. *Id.* at 37–40.  It also heard testimony from the attorney of a client who had inadvertently retained MMA and faced difficulty terminating them. *Id.* at 52–53. The client submitted a notarized statement detailing his efforts to terminate services with MMA, which nonetheless filed a petition on his behalf without his knowledge or consent. *Williams v. State Farm*, No. 2:22-cv-3037, doc. 12, att. 1 (W.D. La. Jan. 12, 2023). The court also heard testimony regarding MMA's improper endorsement of a settlement check in the matter of Melvin Addison. Exh. B, pp. 57–95. It further heard testimony from MMA client Nancy Crockett, who alleged that the firm had dismissed her suit without communicating with her. *Id.* at 95–105. Finally, it heard testimony regarding numerous suits filed against insurers who had never issued a policy to the plaintiff. *Id.* at 105–122.

The court stayed MMA's cases after the first hearing to review the submissions and prevent MMA from mass-settling their cases, given the issues raised.[1] These issues stand in stark contrast to the way thousands of other hurricane cases have proceeded through this court since December 2020. Indeed, over half of the seven thousand Hurricane Laura and Delta cases filed have already been resolved and no firm has drawn anything close to the level of ethical concerns as MMA. Additionally, MMA attorneys have come under scrutiny

---

[1] MMA has also failed to comply with the court's repeated orders to submit documentation in conjunction with its proposed settlements.

in the Eastern District of Louisiana for their handling of Hurricane Ida claims. *See, e.g.*, *Franatovich v. Allied Trust Ins. Co.*, No. 2:22-cv-2552, doc. 59 (E.D. La. Feb. 23, 2023) (order to show cause). Finally, the Louisiana Insurance Commissioner issued a Cease & Desist letter to the firm on February 17, 2023, notifying it that it was under investigation for insurance fraud. Exh. C (LDI Cease & Desist Letter). The investigation and order are based on issues raised in the Addison case, supra, as well as MMA's admissions in the Eastern District of Louisiana, including that it had settled at least eleven claims on behalf of insureds without their knowledge or consent. *Id.*

Under Local Rule 83.2.10, any judge of this court may suspend an attorney for up to ninety days for misconduct without having to seek approval from the other Article III judges of the court or the chief judge. Based on the misconduct before this court, a suspension of the full ninety days for all MMA attorneys who have appeared before the court and for anyone affiliated with that firm is justified. Further, the court is concerned that MMA is committing ongoing misconduct through its poor client communication, use of legal marketing program Velawcity, and failure to properly document its expenses for settlement approval. A suspension is therefore necessary to protect the interest of its current clients in this district.

Accordingly,

**IT IS ORDERED** that the law firm of McClenny Moseley & Associates PLLC and anyone affiliated with the firm, including attorneys R. William Huye III, Claude Favrot Reynaud III, Cameron Sean Snowden, Grant P. Gardiner, John Moseley, and James McClenny be **SUSPENDED FROM PRACTICE** before the United States District Court

for the Western District of Louisiana for a period of **ninety (90) days.** At the conclusion of that period the matter will be referred to a full panel of the Article III judges of this court for consideration of further discipline, which could include permanent suspension from practice in the district.

**IT IS FURTHER ORDERED** that none of the above-referenced attorneys or any attorney affiliated with MMA settle any claims, handle any settlement funds, or make any disbursements of any kind during the period of suspension.

Finally, **IT IS ORDERED** that the above-referenced attorneys submit to Deputy Special Master Cade R. Cole a draft letter by March 10, 2023, informing their clients in this district of the suspension. The letter shall notify the clients that their attorneys have been suspended for ninety days in this district court, with the possibility of the period being extended, and that the clients have the option of either retaining new counsel or remaining with MMA. Mr. Cole will then disseminate the letter.

**THUS DONE AND SIGNED** in Chambers on this 3rd day of March, 2023.

**JAMES D. CAIN, JR.**
**UNITED STATES DISTRICT JUDGE**

23-30671.16

Tab 4

U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED

JUN 0 8 2023

TONY R. MOORE, CLERK
BY:
DEPUTY

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**

**IN RE: ATTORNEYS OF**          **CASE NO. 3:23-MC-0062**
**MCCLENNY MOSELEY & ASSOCIATES**
**PLLC**

**JUDGE TERRY A. DOUGHTY**

## ORDER

On March 3, 2023, a "Memorandum Order" was issued by this Court suspending

attorneys from McClenny Moseley & Associates PLLC ("MMA") for ninety days for

misconduct in the United States District Court, Western District of Louisiana. The time frame for

these suspensions has expired but this Court continues to find that the suspensions of the MMA

attorneys are necessary to protect the interest of clients in the Western District of Louisiana.

Therefore, in accordance with **LR83.2.10(B)(3 )** and the unanimous vote of the Article III judges

of the Western District of Louisiana, this court extends the suspensions previously imposed on

MMA attorneys.

This Court gives notice to the attorneys of MMA that they may individually request a

hearing on these suspensions within 15 days of this Order. Any attorney who does not seek a

hearing within the time frame will be deemed to have waived that right and the extended

suspensions are effective as of the date of this Order.

Accordingly,

**IT IS ORDERED** that notice is given to the following attorneys from McClenny

Moseley & Associates PLLC extending previously imposed suspensions from the practice of law

in the United States District Court, Western District of Louisiana, as follows:

- John Moseley, LAWD Temporary Id No. 917563, suspended one (1) year;

- R. William Huye, III, Louisiana Bar No. 38282, suspended one (1) year;

Case: 23-30671   Document: 19   Page: 25   Date Filed: 11/30/2023

23-30671.236

- Cameron Sean Snowden, Louisiana Bar No. 35333, suspended nine (9) months;

- Claude Favrot Reynaud, III, Louisiana Bar No. 31534, suspended nine (9) months;

- Grant P. Gardiner, Louisiana Bar No. 39888, suspended six (6) months; and

- James McClenny, LAWD Temporary Id No. 917564, suspended six (6) months.

**IT IS FURTHER ORDERED** the attorneys listed above from McClenny Moseley & Associates PLLC are given **15 days from the date of this Order** to seek an opportunity to be heard regarding these suspensions. Any attorney who does not seek an opportunity to be heard regarding the extension of the suspensions, will be deemed to have waived that right and the suspensions are effective as of the date of this Order.

**THUS DONE AND SIGNED** in Chambers on this _____8th_____ day of June, 2023.


_____
**TERRY A. DOUGHTY, CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**

23-30671.237

Tab 5

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA

IN RE: MCCLENNY MOSELEY        CASE NO.  3:23-MC-00062
ASSOCIATES P L L C

                                        JUDGE TERRY A. DOUGHTY

## ORDER

Hearings are set before the Honorable James D. Cain, Jr. on August 8, 2023, regarding the suspension imposed by this court on attorneys associated with McClenny, Moseley & Associates, PLLC ("MMA"). Before considering any modification of the suspension, however, the undersigned wishes to understand more about the state of the firm's IOLTA account. Additionally, MMA has directed clients to call the court with cases regarding their files, and additional questions have arisen regarding potential misconduct. Accordingly, **IT IS ORDERED** that attorneys James McClenny, John Zachary Moseley, Cameron S. Snowden, Claude F. Reynaud III, and Grant P. Gardiner provide the following to the court on or before **August 1, 2023**:

1. Provide the name of the bank, location and account number of the client trust account(s) where any of the MMA Louisiana licensed attorneys deposited client settlement funds for the storm damage claims originating in Louisiana.

2. In connection with the bank account identified in #1 above, provide the full name, address, telephone number, job title, and email address of all persons having signature authority on the account.

3. As to each Louisiana storm damage client whose settlement funds are or were deposited in an out of state client trust account, provide the manner of consent given by the client to have their funds handled in this manner.

4. Provide a full listing of all Louisiana storm damage clients whose settlement funds were deposited into the client trust account(s) identified in #1 above and for each client identified:
   a) Provide any written authorization permitting the MMA Louisiana licensed attorneys to deposit client settlement funds to an out of state client trust account. If no authorizations exist, so indicate.
   b) Provide a listing of the gross settlement amounts received by the MMA Louisiana licensed attorneys for each client represented, and the name of the party/defendant from whom the settlement amounts were received.

5. Provide a full listing of all Louisiana storm damage clients whose settlement funds were deposited into the client trust account(s) identified in #1 above but where there has not yet been a full disbursement of those funds to the parties entitled to receive the proceeds. As to each client identified:
   a) Provide a copy of any disbursement sheet used to calculate any proposed distribution.
   b) Provide account statements or proof that the undistributed funds remain in the client trust account(s) identified in #1 above.
   c) Where there has been no distribution of net settlement proceeds to a Louisiana storm damage client, provide certification that none of the gross settlement funds have been distributed to or for the benefit of the MMA law firm, any attorney now or formerly affiliated with MMA, or third party.

6. Provide a full listing of all Louisiana storm damage clients for whom uncashed checks for settlement funds are currently being held. As to each client identified:
   a) Produce a copy of the uncashed check.
   b) Provide an explanation for why the check has not been cashed and the funds disbursed.
   c) Provide an estimated date for disbursement of the funds.

7. Provide a specific explanation as to the status of the following cases, including whether any settlement funds are being withheld:
   a) Amanda Hester
   b) Rayfield Pickney
   c) Wanda Alexander
   d) Ernestine Mack

e)  Aaron Sonnier
f)  Wilda Marshall
g)  Paul Scott
h)  Michael Richard
i)  Cornelius Hill

**THUS DONE AND SIGNED** in Chambers on the 7th day of July, 2023.

_____
**JAMES D. CAIN, JR.**
**UNITED STATES DISTRICT JUDGE**

Tab 6

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA

IN RE: MCCLENNY MOSELEY           CASE NO. 3:23-MC-00062
ASSOCIATES P L L C

                                   JUDGE JAMES D. CAIN, JR.

## RULING

On July 25, 2023, the Court had a hearing at the request of attorney James McClenny, and on August 8, 2023, the Court had a hearing at the requests of attorneys, Grant P. Gardiner, Claude F. Reynaud, III, John Zachary Moseley and Cameron S. Snowden. The purpose of the hearings was to appeal to the undersigned regarding counsel's suspension from the practice of law in the Western District of Louisiana.[1]

After considering counsel's testimony and the evidence, the Court will modify the term of suspension for Cameron S. Snowden, by reducing his suspension from six (6) to (4) months allowing Mr. Snowden to practice law in the Western District of Louisiana as of October 8, 2023.

As to James McClenny, Grant P. Gardiner, Claude F. Reynaud, III, and John Zachary Mosely, the undersigned finds no just cause to modify their respective suspensions. Accordingly,

**IT IS ORDERED** that the extended suspension from the practice of law as to Cameron S. Snowden is modified from 6 months to 4 months or until October 8, 2023.

**THUS DONE AND SIGNED** in Chambers on this 24th day of August, 2023.

_____
**JAMES D. CAIN, JR.**
**UNITED STATES DISTRICT JUDGE**

---

[1] See Doc. 2 Order extending suspension dated June 8, 2023.

Tab 7

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: ATTORNEYS OF MCCLENNY | § | CASE NO 3:23-MC-0062 |
| MOSELEY & ASSOCIATES, PLLC | § | |
| | § | JUDGE TERRY A. DOUGHTY |
| | § | |
| | § | |

---

## VERIFIED PRE-HEARING MEMORANDUM OF CLAUDE F. REYNAUD III

---

### TABLE OF CONTENTS

I.    Introduction .................................................................................................. 1

II.    The Suspension Orders ............................................................................... 2

III.    Relevant Chronology of Mr. Reynaud's Tenure and Limited Role at MMA ............... 4

IV.    The Issues of Concern alluded to in the Suspension Orders with which Mr. Reynaud Had No Involvement .................................................. 10

     1.   Poor Client Communication ................................................................ 10

     2.   Issues Relating to the way MMA was retained, including MMA's use of the marketing firm named "Velawcity." ................................ 11

     3.   Handling of Settlement Proceeds and Check Endorsements. ............. 12

     4.   MMA's Documenting of Expenses for Settlement Approval. ............. 13

     5.   The February 17, 2023 Cease & Desist Letter issued to MMA by the Louisiana Department of Insurance, and the subsequent Fines Issued. .... 13

     6.   The EDLA Proceedings, including the February 1, 2023 before the EDLA attended by MMA principals, Zach Moseley and William Huye. ............... 16

     7.   MMA's Trust Account. ........................................................................ 18

V.    Mr. Reynaud's Limited Role and Involvement in MMA's 11th Hour E-Filing of the Hurricane Laura/Delta Complaints Now Before this Court. ........... 18

VI.    Mr. Reynaud was presented with a circumstance tantamount to an ethical dilemma. ................................................................................................. 19

VII.    Conclusion .............................................................................................. 22

23-30671.279

# TABLE OF AUTHORITIES

**Statutes and Rules**                                                    *Page(s)*

- Local Rule 83.2.4 ............................................................................................21
- Louisiana Rule of Professional Conduct 1.16 ...............................................21
- Louisiana Rule of Professional Conduct 1.16(b)(1) ......................................21

**Case Law**

- *Toon v. Wackenhut Corrections Corp.*,
  250 F.3d 950, 952-53 (5th Cir. 2001) ..............................................................19

- *McZeal v. Midsouth Nat'l Bank N.A.*,
  2017 WL 2951871 at *1 (W.D. La. July 10, 2017) .........................................20

- *Topalian v. Ehrman*,
  3 F.3d 931, 936-37 (5th Cir. 1993) ..................................................................20

23-30671.280

## **VERIFIED PRE-HEARING MEMORANDUM OF CLAUDE F. REYNAUD III**

Claude F. Reynaud, III, through undersigned counsel, respectfully submits this memorandum in advance of the hearing scheduled for August 8, 2023, regarding the June 8, 2023 Order (the "Suspension Order") suspending him from the practice of law in this Court for an additional nine (9) months. In this memorandum, Mr. Reynaud, for the first time in this Court, tells the story of his tenure at McClenny Moseley & Associates, PLLC ("MMA"), including how he resolved an ethical dilemma over the filing of complaints with this Court, and how he had zero involvement with any of the other identified areas of concerning conduct on the part of MMA, all with the hope that this Court will come to understand why no further discipline against him is warranted and, thus, why the Suspension Order as to Mr. Reynaud should be vacated.

## I.       **Introduction**

During a discrete 5-day period shortly before prescription ran on Hurricane Laura claims, Mr. Reynaud was placed in the precarious position of either permitting his PACER credentials to be used to file complaints or, if not, jeopardizing clients' claims. Mr. Reynaud chose the former option, believing it was in the best interests of MMA's clients. When he did so, Mr. Reynaud was unaware of the issues that plagued MMA's information-verification system.[1] To be sure, Mr. Reynaud became and remains mortified by the situation with MMA and being ensnared in it. Mr. Reynaud respectfully submits, however, that given the circumstances, it was resaonable and understandable for him to resolve an ethical dilemma by relying upon firm protocols that he understood were in place and being followed to ensure the accuracy of information.

---

[1] To be clear, Mr. Reynaud remains unaware of the full extent of MMA's issues.

23-30671.281

Mr. Reynaud already has been sanctioned repeatedly under Rule 11 and suspended from the practice of law in this Court for ninety (90) days. For the reasons articulated in this memorandum, Mr. Reynaud respectfully submits that another 9-month suspension is a disproportionately severe penalty that is much more severe than what is necessary to achieve the intended purposes. Accordingly, and for all the many reasons discussed in this memorandum, Mr. Reynaud asks that the Court reconsider and conclude that no further discipline of him is necessary.

## II.    <u>The Suspension Orders</u>

Three (3) Orders have been issued by this Court that are pertinent to this memorandum and the upcoming August 8, 2023 hearing (collectively, the "Orders"). First, the original, 90-day interim suspension Order, entered on March 4, 2023, refers to conduct generally by the "MMA attorneys" concerning **(1)** faulty or unfounded filings in this Court, specifically including "duplicate filings, cases filed against insurers who had no policy in place with the plaintiff, and cases filed on behalf of plaintiffs who had already settled their hurricane claims with the insurer," **(2)** "client communication," **(3)** "the way MMA had been retained," including MMA's use of a marketing firm named "Velawcity," **(4)** the "handling of settlement proceeds" and "MMA's improper endorsement of a settlement check in the matter of Melvin Addison," **(5)** MMA's "failure to properly document its expenses for settlement approval," **(6)** the "Cease & Desist letter" issued by the Louisiana Insurance Commissioner to MMA on February 17, 2023 notifying MMA that "it was under investigation for insurance fraud" on the basis of the improper check endorsement noted *supra* and other admissions made by MMA's principals at the February 1, 2023 hearing before the Eastern District of Louisiana (the "EDLA"), including their admission to the EDLA that MMA had evidently "settled at least eleven claims on behalf of insureds without their knowledge or consent," and finally, **(7)** the proceedings held in the EDLA, the specifically including the February 1, 2023

hearing attended by MMA principals, Zach Moseley and William Huye, regarding MMA's "handling of Hurricane Ida claims." *See* the March 4, 2023 Memorandum Order, pp. 1-3.

Approximately 96 days later, on June 8, 2023, the Court entered another Order, *sua sponte* and without a hearing, extending the previous 90-day suspensions against the "MMA attorneys," including against Mr. Reynaud for an additional 9 months, noting threrein, without elaboration, that the "Court continues to find that the suspensions of the MMA attorneys are necessary to protect the interest of clients in the Western District of Louisiana." *See* June 8, 2023 Order, p. 1. That Order also indicated that the respondent lawyers could request a hearing within 15 days or else waive that right. Mr. Reynaud timely requested a hearing on this matter, as directed in the Order.

Finally, on July 7, 2023, another Order was entered in advance of the August 8, 2023 hearig, this time regarding **(8)** the state of MMA's trust/IOLTA account, and further specifically directing all of the same "MMA attorneys," including Mr. Reynaud, to provide certain documents and information relating to MMA's trust account by August 1, 2023. Mr. Reynaud will respond to that Order by the deadline, but it bears emphasis now that Mr. Reynaud was never involved in any way with the establishment, maintenance, or activity in MMA's trust account and does not now possess, and never did possess, any information or documents relating to MMA's trust account. In fact, Mr. Reynaud, having never been designated as the responsible lawyer for the account, and having never used that account or been provided access to that account for any reason, does not even know the bank where the trust account was (or is) kept.

Out of these approximately 8 areas of concern identified by the Court in its Orders, only <u>one</u> pertains to or references conduct with which Mr. Reynaud had *any* involvement: namely, the filing of faulty complaints in this Court. This issue is addressed in much detail further below.

Otherwise, each of the other seven (7) identified issues or areas of concerning conduct, each of which is also addressed below, can and should be quickly dispatched as it relates to Mr. Reynaud,

as Mr. Reynaud had no part or involvement whatsoever in any of this alleged conduct. The Court's Orders, of course, allege misconduct on the part of the "MMA attorneys" and MMA in general, but do not allege anything against Mr. Reynaud specifically. Thus, because the Orders do not differentiate between the respondent "MMA attorneys" and the various conduct alleged, Mr. Reynaud will endeavor to address each of these other seven (7) areas of concern, even if only briefly.

## III.   Relevant  Chronology of Mr. Reynaud's Tenure and Limited Role at MMA

First though, in order to better understand the environment at MMA, it is critical to keep in mind that MMA's principals (not Mr. Reynaud) organized the firm in a unique way. Specifically, the law firm was highly compartmentalized with lawyers and staff members assigned to very specific roles. Lines were not to be crossed. This helps to explain how and why it is that Mr. Reynaud participated in so few (namely, one) of the many issues that have been swirling around MMA. Thus, in this vein, and before discussing the issues raised by the Court, it is important to understand some of the the chronology of Mr. Reynaud's tenure and limited role at MMA.

1.      Prior to joining MMA, Mr. Reynaud had a spotless disciplinary record, and he had never once been sanctioned by any court.

2.      Mr. Reynaud was hired by MMA in September 2021 following Hurricane Ida specifically and almost exclusively to litigate hurricane cases *once lawsuits were filed* with the courts. Although he was listed as a "partner" on the firm website, this designation was strictly for business-development purposes only;[2] he had no partnership or equity interest in MMA, was never involved in the management of MMA, never acted or participated in any management or

---

[2] *See* Email dated September 22, 2021, between Mr. Reynaud and James McClenny *et al.* regarding Mr. Reynaud's contemplated role and title at MMA, attached hereto as "Exhibit 1."

partnership roles or meetings,[3] and—as was just recently made known to him—was evidently paid significantly less than many of the so-called "associates" at the firm.

3.      In the several months immediately after being hired by MMA, Mr. Reynaud acquired a handful of his own clients organically, almost entirely through word of mouth, after advising his family and friends of his move to MMA. Mr. Reynaud worked closely with these few clients and handled these cases himself, all of which pertained to property damage caused by Hurricane Ida; and ultimately, he was able to reach settlement agreements in a few of these cases prior to filing suit. However, even with these few cases, as with <u>all</u> MMA cases in Louisiana, MMA's Louisiana Managing Partner, Mr. Huye, was the primary "handling" or responsible attorney.[4]

4.      Consistent with his narrowly defined role, Mr. Reynaud was specifically <u>not</u> responsible for assigning estimators, drafting or sending letters of representation to insurers, drafting or sending general correspondence to insurers or clients *prior to suit being filed*, handling settlement proceeds, or check processing;[5] all of these areas were handled by Mr. Huye and/or others at MMA, all pursuant the systems of processes and procedures implemented by Mr. Huye.

5.      According to the duties delegated to him by Mr. Huye, Mr. Reynaud's responsibilities at MMA only began *once lawsuits were filed* with the courts. That is, Mr. Reynaud was not assigned to handle any specific MMA case or work with any MMA client *unless and until a lawsuit was filed and a specific, substantive litigation issue arose* that required attention, including, *e.g.*, depositions, written discovery, motion practice, etc.

6.      As directed by Mr. Huye, Mr. Reynaud's defined, limited role at MMA was

---

[3] Affidavit of Melanie Farrell, attached hereto as "<u>Exhibit 2</u>," at ¶¶ 11, 16; Affidavit of Heather Melaas, attached hereto as "<u>Exhibit 3</u>, "at ¶¶ 9, 11.

[4] Affidavit of Melanie Farrell, Exh. 2, at ¶ 19; Affidavit of Heather Melaas, Exh. 3, at ¶ 7.

[5] Affidavit of Melanie Farrell, Exh. 2, at ¶ 13.

primarily, if not exclusively, to handle cases *only once they were filed in court and a specific, substantive litigation issue arose*; Mr. Reynaud was never supposed to be involved in the process of filing hurricane lawsuits in the first instance (although, as will be seen, this changed briefly in August 2022 at the veritable eve of prescription).

7.      Starting in the late Spring of 2022, Allied Trust Insurance Company ("Allied Trust") filed numerous actions for declaratory relief to enforce an appraisal provision. Mr. Reynaud was assigned these cases by Mr. Huye, which were roughly 12-15 in number. It was at this time that Allied Trust's first stated to Mr. Reynaud that he suspected that MMA may not represent the clients it held itself out to represent, and that MMA may not have signed contracts with these clients. In response, Mr. Reynaud immediately reviewed the client files and independently verified, in *each* of these several cases, that, contrary to these allegations, there *were* in fact signed contracts in *each* of these cases between MMA and the respective insureds.  It was in this context that Mr. Reynaud first heard the name "Apex," which at the time he believed was simply one of the adjusting companies used by MMA to prepare property damage estimates for purposes of settlement and litigation. Nothing in any of these client files, however, made any reference whatsoever to Apex. After verifying the existence of signed retainer agreements between each of these clients and MMA, Mr. Reynaud offered to provide copies of these signed contracts to Allied Trust and firmly believed thereafter, particularly with the input of Mr. Huye, that counsel for Allied Trust was simply misinformed. Mr. Reynaud had no reason to believe otherwise.

8.      Mr. Reynaud did not hear of these issues or Apex again until December 13, 2022, when he appeared with Mr. Huye before this Court and was blindsided by the multiple issues and problems being alleged by defense counsel, including issues relating to a check endorsement. This marked the first instance where Mr. Reynaud was alerted to the heightened need to protect client interests by ensuring that complaints had been properly filed. On the drive back to New Orleans,

moreover, Mr. Huye dispelled the notion of any wrongdoing on the part of MMA as it related to Apex, assuring Mr. Reynaud for the first time (but not the last) that there were signed contracts directly between MMA and every single client it purported to represent. Regrettably, Mr. Reynaud believed Mr. Huye and trusted him as MMA's Louisiana Managing Partner.[6]

9.      Beginning in the Summer of 2022, Mr. Reynaud's understanding, per multiple discussions with Mr. Huye, was that roughly 100 lawsuits would need to be filed in this Court relating to Hurricanes Laura and Delta. According to Mr. Huye, these lawsuits were to be filed on behalf of multiple plaintiffs using the procedure of permissive joinder. Mr. Huye boasted that *he alone* personally would be the signatory and filing attorney on each of these lawsuits.[7]

10.     However, Mr. Huye's plan changed after the first of these lawsuits was filed on or about August 18, 2022. That initial filing was rejected in the days following its filing by this Court on the basis that permissive joinder could not be invoked. Instead, the Court ordered that each lawsuit needed to be filed separately on behalf of each individual plaintiff.[8]

11.     Shortly thereafter, Mr. Huye announced to the MMA staff and office that the new plan was to file more than 1,000 lawsuits within the coming week, as prescription on Hurricane Laura claims was imminent.[9] The exact number of lawsuits to be filed was never communicated to Mr. Reynaud.  Cordoned off from the project, Mr. Reynaud only understood that the number was large (*i.e.*, likely more than 1,000), and that all of the lawsuits were to be filed within a week. Consistent with the joinder of filings, Mr. Huye made clear that he would be the signatory and

---

[6] Some mention has been made of a previous hearing regarding these issues in October 2022; Mr. Reyaud was not present at that hearing.

[7] *See* Affidavit of Melanie Farrell, Exh. 2, at ¶ 22.

[8] *See* Affidavit of Melanie Farrell, Exh. 2, at ¶ 23.

[9] To Mr. Reynaud's recollection, MMA filed its lawsuits for Hurricanes Laura *and* Delta by the prescriptive deadline for Hurricane Laura.  This is so, because many clients were affected by both storms, and there was only a relatively small number of "Delta only" claims.

filing attorney on all lawsuits.

12.     The plan, however, changed once more. After the close of business on Friday, August 19, 2022, Mr. Huye texted Mr. Reynaud and two other of MMA's Louisiana lawyers advising that it was necessary for each of them to provide access to their PACER accounts in order to timely file all of the complaints. More particularly, Mr. Reynaud and others were informed by Mr. Huye that it would be possible to file all the lawsuits *only* if staff members worked around the clock using *all four* PACER accounts. Otherwise, Mr. Huye indicated a substantial number of lawsuits would not be filed, and the clients' claims would prescribe.

13.     Even though it was outside of Mr. Reynaud's usual method of practice, the situation of duress and extreme urgency demanded Mr. Reynaud capitulate to Mr. Huye's request to look out for MMA's clients. Mr. Reynaud in fact believed that if he did not acquiesce to Mr. Huye's request, a great many of MMA's clients' valid claims would prescribe. Mr. Reynaud, therefore, ultimately decided to to do what he believed was in the clients' best interests, which was to allow his PACER account to be used in an effort to have all complaints timely filed.

14.     Mr. Huye repeatedly assured Mr. Reynaud (and everyone else at MMA) that all information to be alleged in the lawsuits—including, *e.g.*, the defendant insurance company, date of loss, loss address, and policy number—had been verified to best of his knowledge and ability based on information or documentation from the client, information or documentation from the insurance company, or a combination of both, and that he would have been the sole signatory were it not for the time limitations given the proximity to the prescriptive date. Based on these explicit assurances, and at MMA's request, Mr. Reynaud allowed his PACER account to be used for purposes of filing the complaints, which he was told (and believed) was necessary to protect the clients' interests given the time constraints and the statute of limitation deadlines that were fast approaching at the time of filing. Indeed, it was only with these explicit assurances, which he (by

virtue of his rigid role at MMA) had no reason to doubt, that Mr. Reynaud allowed his PACER credentials to be used to file complaints.

15. This is the only time Mr. Reynaud has ever allowed his PACER account to be used in this manner. He had never before, and has never since allowed his PACER to be used without first independently verifying the veracity of the allegations asserted in the pleading to be filed. Incidentally, his PACER account was also never used to file *any other* complaints during his time at MMA, including in either the Middle or Eastern Districts of Louisiana. The use of his PACER account in this Court, of course, only occurred in light of the unique, extenuating circumstances surrounding the filings in this Court, as discussed in this memorandum.

16. On the afternoon of Friday, February 17, 2023 (the Friday before Mardi Gras), the Louisiana Department of Insurance ("LDI") issued the "Cease & Desist" Letter (the "LDI Letter") to MMA and to its principals and managers, namely, Mr. Huye, Zach Moseley, and James McClenny. It was at this time that it first became apparent to Mr. Reynaud that MMA and its principals were facing major issues of which Mr. Reynaud had no prior knowledge. Accordingly, Mr. Reynaud began making immediate plans to depart MMA, which he discussed with several others over the ensuing Mardi Gras holiday. He would ultimately submit his resignation roughly two weeks (or 8 business days) later.

17. On or about Tuesday, February 28, 2023, Mr. Reynaud reviewed for the first time the transcript from the February 1, 2023 hearing in the EDLA, and upon doing so, it became immediately apparent that the substance and tenor of the February 1, 2023 had been misrepresented to him, particularly as it related to Apex and Velawcity and the problems stemming from those relationships. Accordingly, it was at this time that Mr. Reynaud decided that he would very soon be resigning from MMA, and he thus quickly began developing an emergency exit plan.

18. Specifically, Mr. Reynaud and Grant Gardiner began making plans to depart MMA

together and form their own law firm. To this end, they together formed REYNAUD GARDINER, LLC (by filing their articles of organization with the Louisiana Secretary of State)[10] on or about Friday, March 3, 2023, and planned to give their notice of resignation to MMA the following week.

19.     Unfortunately, the planned exit did not come soon enough, and on Saturday, March 4, 2023, Mr. Reynaud, along with all of the signatory attorneys at MMA, were suspended from practice in the Western District of Louisiana for ninety (90) days.

20.     Hours later, on Saturday, March 4, 2023, Mr. Reynaud tendered his formal resignation to MMA, effective immediately.

## IV.   The Issues of Concern alluded to in the Suspension Orders with which Mr. Reynaud Had No Involvement

### 1.     Poor Client Communication.

One of the areas of concern identified by the Court in its original, 90-day suspension Order relates to "client communication." *See* March 4, 2023 Memorandum Order, p. 1. That Order goes on to state, generally, that of the "MMA clients" from whom the Court had heard oral testimony, "none of [them] appeared to have adequately communicated with their attorneys before suit was filed". *Id.* Although the Orders do not allege a lack of communication on Mr. Reynaud's part specifically, Mr. Reynaud will endeavor to address that area of concern here as it relates to him alone.

At the outset, it should be noted that Mr. Reynaud was instructed repeatedly during his time at MMA by Mr. Huye (Mr. Reynaud's direct supervisor) not to speak to any client to whom he was not directly assigned. His message to Mr. Reynaud, on multiple occasions, was that Mr.

---

[10] *See* the the Articles of Organization signed by the prospective members of Reynaud Gardiner, LLC (including Mr. Reynaud) on March 3, 2023, attached hereto as "Exhibit 4." Incidentally, the filing of the Articles of Organization that day was ultimately rejected as deficient, due to some clerical issue of which Mr. Reynaud is not immediately aware; as a result, the LLC was never actually effectuated.

Reynaud's "time was too valuable" to speak to the clients.[11] Mr. Reynaud, however, ignored that directive and spoke to clients regularly.  In fact, Mr. Reynaud was the <u>only</u> attorney at MMA who had both his work number *and his cell phone number* listed publicly on the firm website. Likely for this reason, Mr. Reynaud often fielded calls, often after business hours and on weekends, from clients (to most of whom he had never before spoken) and assisted them as best he could. To this end, Mr. Reynaud would answer any general questions he could at the time, and then often return a phone call to the client with additional information upon reviewing the file or otherwise requesting information from others at MMA.

Though again it was not within his sphere of responsibility as delineated by Mr. Huye, Mr. Reynaud's efforts to communicate with MMA clients did not end with telephone calls. Mr. Reynaud was also the only lawyer other than Katie Aromi in MMA's New Orleans office who would speak with clients who appeared at the office unannounced. No other MMA lawyers were willing to do this. This is all in addition, moreover, to Mr. Reynaud's regular, consistent communication with MMA clients whose claims were in active litigation. In sum, therefore, by making himself conveniently accessible to clients even before their matters reached an active stage of litigation, Mr. Reynaud more than met the duty to communicate. Any allegations to the contrary are simply misplaced.

2.    **Issues Relating to the way MMA was retained, including MMA's use of the marketing firm named "Velawcity."**

Another area of concern identified by the Court in its original, 90-day interim suspension Order is "the way MMA had been retained." *See* March 4, 2023 Memorandum Order, p. 1. This, presumably, refers to the way MMA acquired its clients and had them sign retainer agreements,

---

[11] *See* Affidavit of Melanie Farrell, Exh. 2, at ¶ 21.

which, based on what Mr. Reynaud now knows and understands, was reportedly carried out, at least in part, by a marketing firm named "Velawcity." Incidentally, the Court's Order also identifies as another area of concern MMA's use of "Velawcity." *Id.*, at p. 3. Thus, because these two identified issues are seemingly interconnected, Mr. Reynaud will address them here together.

Again, given his defined role at MMA, Mr. Reynaud, during his time there, never had any knowledge or information regarding any of the means by which MMA conducted its marketing efforts or acquired its clients, whether through Velawcity or otherwise. Mr. Reynaud was unequivocally never involved in any way, and was never given any responsibility for, any of MMA's marketing efforts or client intake. Mr. Reynaud thus was completely unaware of Velawcity's role as it related to MMA's marketing efforts or the acquisition of MMA clients.

Although Mr. Reynaud tangentially knew of Velawcity's existence while at MMA, he was specifically told by Mr. Huye that Velawcity was a traditional marketing company that placed print and media ads online and throughout the region, which were ubiquitous. Regardless, Mr. Reynaud had zero involvement in any of MMA's marketing or client-acquisition efforts, and he had no involvement whatsoever with Velawcity.[12]

### 3. Handling of Settlement Proceeds and Check Endorsements.

One of the other areas of concern identified by the Court in its original, 90-day interim suspension Order is MMA's "handling of settlement proceeds," including, in particular, "MMA's improper endorsement of a settlement check in the matter of Melvin Addison." *See* March 4, 2023 Memorandum Order, p. 1. To be clear, Mr. Reynaud did not endorse the check at issue and does not know who made that endorsement. In fact, Mr. Reynaud never endorsed any check at MMA, and never had the authority or responsibility to do so. Mr. Reynaud had no access to MMA's

---

[12] Affidavit of Melanie Farrell, Exh. 2, at ¶ 17; Affidavit of Heather Melaas, Exh. 3, at ¶ 12.

accounting department or accounting processes.[13] He also had no participation, authority, or involvement whatsoever in the receiving, processing, handling, or disbursing of settlement checks or settlement proceeds.[14]

**4.      MMA's Documenting of Expenses for Settlement Approval.**

Another area of concern identified by the Court in its original, 90-day interim suspension Order is MMA's "failure to properly document its expenses for settlement approval." *See* March 4, 2023 Memorandum Order, p. 3. Given his limited role at MMA that has been described throughout this memorandum, Mr. Reynaud had no involvement, participation or input in the documentation of case expenses for clients. Nor does he know who at MMA was responsible for documenting any such expenses. Mr. Reynaud further had no participation or involvement in the processing, handling, or breaking down of settlement proceeds based on attorney fees and costs owed, etc., and never once submitted any expenses on behalf of any client. All of that was handled exclusively by others at MMA, all as directed and assigned by Mr. Huye.

**5.      The February 17, 2023 Cease & Desist Letter issued to MMA by the Louisiana Department of Insurance, and the subsequent Fines Issued.**

Another area of concern identified by the Court in its original, 90-day interim suspension Order is the "Cease & Desist letter" issued to MMA by the Louisiana Insurance Commissioner on February 17, 2023, which notified MMA that it was "under investigation for insurance fraud."  *See* March 4, 2023 Memorandum Order, p. 3. Indeed, on the afternoon of Friday, February 17, 2023 (the Friday before Mardi Gras), the Louisiana Department of Insurance ("LDI") issued the aforementioned "Cease & Desist" letter (the "LDI Letter"), both to MMA and Messrs. Huye,

---

[13] Affidavit of Melanie Farrell, Exh. 2, at ¶¶ 13, 16; Affidavit of Heather Melaas, Exh. 3, at ¶¶ 13-14.

[14] Affidavit of Melanie Farrell, Exh. 2, at ¶ 14.

Moseley, and McClenny, relating to MMA's engagement of policyholders through Apex and representations made to insurance companies.

Elaborating on the point, the LDI Letter was specifically addressed to Messrs. Huye, Moseley, and McClenny,[15] and not to anyone else, and gave notice that they, along with MMA, were under investigation. In particular, the LDI Letter alleges that "[MMA] and its principals, managers and/or partners William Huye III, John Moseley and James McClenny … participated in a fraudulent scheme involving fraudulent insurance acts," specifically relating to the nature of MMA's relationship with Apex, or more particularly, MMA's alleged misrepresentations in writing to Louisiana insurance carriers that MMA had been retained by Louisiana policyholders to pursue their Hurricane Ida claims,[16] when it represented only Apex.  *See* LDI Letter, at ¶¶ 3-9.

Significantly, however, all of the alleged incidents set forth in the LDI Letter would have been committed by MMA principals, Messrs. Huye, Moseley, and McClenny, and more importantly, without Mr. Reynaud ever being aware, or ever having any knowledge or information regarding, the same. Indeed, up until middle-to-late February 2023, Mr. Reynaud was unaware of the alleged true nature of the relationship between MMA and Apex and any problems stemming therefrom. Rather, as alluded, Reynaud previously believed that Apex was merely one of the adjusting companies or estimators used by MMA to prepare property damage estimates for purposes of settlement and litigation. During his time at MMA, Mr. Reynaud never once

---

[15] There were actually four (4) identical "Cease & Desist" letters issued by the LDI on February 17, 2023: one to MMA, and one each to Messrs. Huye, Moseley, and McClenny. The LDI Letter was not sent to anyone else, and did not mention or reference any other person at MMA.

[16] Incidentally, it is also worth noting that the relationship between Apex and MMA evidently only pertains to Hurricane *Ida* claims, and not to any claims relating to Hurricanes Laura or Delta.  Thus, there is no hurricane claim or lawsuit currently before this Court (*i.e.*, there is no claim or lawsuit relating to Hurricanes Laura or Delta) that involves any policyholder or insured who contracted with Apex; Apex's involvement vis-à-vis MMA is limited strictly to Hurricane *Ida*, all of which is properly being dealt with by the EDLA (and to a lesser extent, the MDLA).

communicated or interacted with anyone at Apex, never saw any contract between MMA and

Apex, never settled or litigated any hurricane claim or case in which Apex was involved, and never

dealt with any policyholder who had also contracted with or even spoken to Apex.  In fact, upon

information and belief, or as Mr. Reynaud has since been told since leaving MMA, there may have

been filtering restrictions in place in MMA's client management software such that any client or

claim involving Apex was not viewable by Mr. Reynaud.[17]

In any event, Mr. Reynaud received and reviewed the LDI letter the same day that it was

issued (Friday, February 17, 2023). When Mr. Reynaud brought his concerns about the LDI letter to

Mr. Huye later that same afternoon, Mr. Huye assured Mr. Reynaud (and several others in the MMA

New Orleans office) that the allegations set forth in the LDI Letter were either untrue or otherwise

taken out of context and that nothing would come of it, since, as Mr. Huye tried to explain, the matter

was "politically motivated."[18] By this point, however, and particularly after having read the LDI

Letter himself, Mr. Reynaud no longer trusted Mr. Huye, and thus, it was on this same day (February

17, 2023) that Mr. Reynaud began making definitive plans to depart MMA. Again, he would

ultimately submit his resignation roughly two weeks (8 business days) later.

Ultimately, on May 1, 2023, well after Mr. Reynaud had resigned from MMA, and on the

basis of the allegations set forth in the LDI Letter and LDI's subsequent investigation, the LDI issued

fines against MMA, and specifically against Messrs. Huye, Moseley, and McClenny, individually,

each in the amount of $500,000 (the maximum amount allowed by law), for unfair trade practices

---

[17] Affidavit of Melanie Farrell, Exh. 2, at ¶ 18.

[18] Affidavit of Melanie Farrell, Exh. 2, at ¶ 30.

and insurance fraud.[19] Significantly, neither Mr. Reynaud nor anyone else currently or formerly affiliated MMA was fined any amount of money or otherwise even referenced in the LDI Letter or in the LDI's subsequently issued "Notice of Fine" documents.[20] And this was for good reason: Mr. Reynaud) had nothing to do with, or had no knowledge or information about, any of the conduct that was investigated, found, or penalized by the LDI.

### 6. The EDLA Proceedings, including the February 1, 2023 before the EDLA attended by MMA principals, Zach Moseley and William Huye.

Another area of concern identified by the Court in its original, 90-day interim suspension Order is to the "MMA attorneys" having "come under scrutiny in the Eastern District of Louisiana for their handling of Hurricane Ida claims." *See* March 4, 2023 Memorandum Order, pp. 2-3. Although the Orders do not expound any further or offer any other guidance as to what this might be referencing, given the date of the March 4, 2023 Memorandum Order, Mr. Reynaud surmises this may refer, at least in part, to the February 1, 2023 hearing held before Magistrate Judge Michael B. North in EDLA in the matter of *Franatovich v. Allied Trust Insurance Company*, No. 2:22-cv-02552-LMA-MBN (E.D. La. 2022), which was attended by MMA principals, Messrs. Moseley and Huye, regarding MMA's handling of Hurricane Ida claims. Mr. Reynaud was not invited to attend and did not attend that hearing and was generally unaware of the issues to be addressed.

Mr. Huye returned from the hearing that day representing to the MMA office and employees (Mr. Reynaud included) that the hearing had gone better than expected,[21] and that Judge

---

[19] *See* Louisiana Department of Insurance, *Donelon Issues $2 Million in Total Fines to McClenny Moseley & Associates for Massive Insurance Fraud Scheme*, News Release (May 2, 2023), available at: https://www.ldi.la.gov/news/press-releases/5-2-23-donelon-issues-2-million-in-total-fines-to-mcclenny-moseley-and-associates-for-massive-insurance-fraud-scheme (last visited July 16, 2023).

[20] *See* the LDI's four (4) "Notice of Fine" documents here, each dated May 1, 2023, including one each for MMA, Mr. Huye, Zach Moseley, and James McClenny.

[21] Affidavit of Melanie Farrell, Exh. 2, at ¶ 29.

North was at least as concerned with the behavior of counsel for Allied Trust Insurance Company as it was with MMA's behavior.  A plain reading of the hearing transcript, however—which Mr. Reynaud did not obtain until several weeks later, discussed *infra*—shows that Mr. Huye had misreported what had transpired at that hearing.

On the morning of February 28, 2023, Mr. Reynaud received and reviewed for the first time the transcript from the February 1, 2023 hearing before the EDLA, and upon doing so, it substantially bolstered what the LDI Letter had indicated just 11 days earlier: that MMA was facing a number of major issues of which Mr. Reynaud had no prior knowledge. In particular, the transcript from the February 1, 2023 hearing contains shocking statements by Mr. Huye regarding MMA's relationship with and engagement of policyholders through Apex, and more particularly, the subsequent representations to insurance companies that MMA had been retained by Louisiana policyholders to pursue their Hurricane Ida claims when, in fact, MMA only represented Apex. Mr. Huye also admitted, among other things, that it was in this context that MMA had apparently settled multiple claims on behalf of insureds without their knowledge or consent. Mr. Moseley also spoke at the February 1, 2023 hearing regarding MMA's marketing efforts and its acquisition of clients, particularly via online advertising, through "Velawcity."  Notably though, none of the alleged conduct addressed at the hearing regarding Apex or Velawcity involved Mr. Reynaud, who would resign from MMA four (4) days after reviewing the transcript. Furthermore, review of Magistrate Judge North's March 16, 2023 Order and Reasons makes it clear that, in this period, the principals MMA still was not being truthful even with Court.

Again, during his entire time at MMA, Mr. Reynaud never once communicated or interacted with anyone at Apex nor ever saw any contract between MMA and Apex.[22] Similarly,

---

[22] *See* Affidavit of Melanie Farrell, Exh. 2, at ¶ 17; Affidavit of Heather Melaas, Exh. 3, at ¶ 12.

with respect to Velawcity, Mr. Reynaud had always been told by Mr. Huye and others at MMA, and he had always believed, that Velawcity was simply a traditional marketing company.[23] The bottom line, to the extent it has not already been been made clear in this memorandum, is that Mr. Reynaud had no part in or involvement with MMA's relationships with either Apex or Velawcity.

Ultimately, in light of the proceedings at the February 1, 2023 hearing and subsequent filings and document productions provided by Mr. Huye and/or MMA, Magistrate Judge North issued an *Order and Reasons* on March 16, 2023, wherein he was critical of MMA, and in particular, Mr. Huye and Mr. Moseley for "misconduct on a scale likely never before seen" and indicated that he would be recommending Mr. Huye for discipline similar to that which was imposed by this Court. Mr. Reynaud is not discussed, or even mentioned or referenced, in the March 16, 2023 Order and has not been disciplined by the EDLA.

### 7. MMA's Trust Account.

Mr. Reynaud was never involved in any way with the establishment, maintenance, or activity in MMA's trust account and does not now possess, and never did possess, any information or documents relating to MMA's trust account. In fact, Mr. Reynaud, having never been designated as the responsible lawyer for the account, and having never used that account or been provided access to that account for any reason, does not even know the bank where the trust account was or is kept.

## V. Mr. Reynaud's Limited Role and Involvement in MMA's 11th Hour E-Filing of the Hurricane Laura/Delta Complaints Now Before this Court.

This leaves only the filing of the complaints that turned out to be faulty for which Mr. Reynaud has already been sanctioned repeatedly under Rule 11. Recapping the events pertinent

---

[23] Although Mr. Reynaud knew the name of Velawcity's CEO and owner, Phil Votiero, he only knew Mr. Votiero casually through out-of-office get-togethers, and never talked to or interacted with Mr. Votiero at any time about any type of marketing or other business. Again, as far as Mr. Reynaud knew, Mr. Votiero was simply the CEO of a marketing firm that MMA used to place its advertisements.

to that issue: **(1)** Mr. Reynaud was not supposed to be involved in filing lawsuits *at all*—Mr. Huye was supposed to be the lone signatory; **(2)** Mr. Huye initially planned to accomplish this by filing by way of permissive joinder—it failed; **(3)** Mr. Huye thereafter announced that the more than 1,000 individual lawsuits would be filed within a week before the prescriptive deadline on Hurriane Laura claims—again Mr. Huye was supposed to be the lone signatory;[24] **(4)** after it was determined that was not logistically possible, Mr. Huye requested use of Mr. Reynaud's (and others') PACER accounts; **(5)** as understood by Mr. Reynaud, the option was to acquiesce to the request or allow claims to prescribed; **(6)** Mr. Reynaud was given assurances as to the integrity of the information to be pleaded in the lawsuits; and **(7)** only with those assurances did Mr. Reynaud agree to permit his PACER credentials to be used.

This was the first and last occasion on which Mr. Reynaud allowed his PACER credentials to be used in this fashion.

## VI.   <u>Mr. Reynaud was presented with a circumstance tantamount to an ethical dilemma.</u>

This Court and the Fifth Circuit have made important statements regarding sanction procedure in the analogous contexts of Rule 11 matters and the exercise of inherent judicial power. In *Toon v. Wackenhut Corrections Corp.*, 250 F.3d 950, 952-53 (5th Cir. 2001), for instance, the Fifth Circuit noted that sanction authority should be exercised with "great restraint and caution" and that a specific finding of bad faith is required. *Id.* This Court, moreover, has followed the Fifth Circuit's direction that, in ordering sanctions, a court should consider, among other things of no relevance here, the conduct being punished or deterred and whether the sanction is the least severe one that can

---

[24] To Mr. Reynaud's recollection, MMA filed its lawsuits for Hurricanes Laura *and* Delta by the prescriptive deadline for Hurricane Laura.  This is so, because many clients were affected by both storms, and there was only a relatively small number of "Delta only" claims.

23-30671.299

adequately achieve the intended purposes. *See McZeal v. Midsouth Nat'l Bank N.A.*, 2017 WL 2951871 at *1 (W.D. La. July 10, 2017) (citing *Topalian v. Ehrman*, 3 F.3d 931, 936-37 (5th Cir. 1993).

With these principles in mind, the question presented by this proceeding is whether it would be appropriate suspend Mr. Reynaud for an additional nine (9) months for his one-time decision to allow his PACER credentials to be used over a roughly five-day period immediately prior to prescription on hurricane claims. Respectfully, Mr. Reynaud submits the answer to that question is "no" and, further, that the previous 90-day suspension and numerous Rule 11 sanctions (which Mr. Reynaud is struggling to pay) are sufficient to dissuade him from repeating that practice. In that regard, and again respectfully, Mr. Reynaud should be judged not with the benefit of hindsight now that the deficiencies in MMA's "technology" processes have been exposed, but instead with a "snapshot" view of what was known by him at the time these events were quickly unfolding.

In that respect, when Mr. Reynaud received Mr. Huye's email that Friday evening at the eleventh hour before prescription, he faced the stark choice of either permitting use of his PACER credentials or allowing claims to prescribe. That is not hyperbole. Because of the manner in which the PACER system functions, it is unavoidable that—had Mr. Reynaud (or any of the other involved lawyers) refused the Louisiana Managing Partner's directive—a staggering number of claims could not have been filed at all. Complicating matters, and once again pursuant to his arrangement with MMA, Mr. Reynaud was not supposed to have a role in filing lawsuits, but instead was to begin work on a matter when it reached a stage of active litigation.

Mr. Reynaud followed what he believed to be a sensible and, more importantly, client-protective course of action. As recounted above, having not been involved whatsoever with the client-retention or client-intake process, Mr. Reynaud sought and received assurances directly from Mr. Huye that the integrity of the data appearing in MMA's records was sound. It was only with reliance on those assurances, which he at the time had no reason to question (*i.e.* at the time of the

"snapshot"), that Mr. Reynaud acquiesced to the use of his PACER account. While Mr. Reynaud now regrets it, his decision to stay and try to help the clients finds roots in the Louisiana Rules of Professional Conduct (the "LRPC") that have been adopted by this Court.[25]

By way of explanation, under certain circumstances, walking out of MMA at that juncture could have been viewed as a withdrawal from any representation of the law firm's clients by Mr. Reynaud.  Termination of representation is governed by LRPC 1.16, a rule with two main sections regarding the two types of withdrawal recognized in Louisiana: mandatory and permissive.  Once again, in the "snapshot" moment, Mr. Reynaud had no cause to disbelieve Mr. Huye's assurances about the accuracy of the data. Accordingly, Mr. Reynaud would have known of no basis for a mandatory withdrawal and, rather, would have been relegated to a permissive withdrawal under LRPC 1.16(b). That provision sets forth a series of scenarios in which a permissive withdrawal is proper, but only one of them applies to Mr. Reynaud. Namely, a lawyer generally may withdraw at any time and for any reason *as long as the "withdrawal can be accomplished without material adverse effect on the interests of the client."* Rule 1.16(b)(1) [*emphasis* supplied].

Losing the ability to file suit due to a lawyer's untimely withdrawal (or abandonment of the client) is a prime example of "material adverse effect." It follows that, if Mr. Reynaud had abruptly left MMA in August 2022, and if all of MMA's complaints had turned out to be accurate (as Mr. Huye had claimed) and claims had prescribed as a result, Mr. Reynaud ironically could have been faulted, potentially, for abandoning the clients. All of this is to show that, for Mr. Reynaud and through no fault of his own, there was no guaranteed "safe" course of action to take that would have insulated him from scrutiny. In similar situations where an issue arises in close proximity to

---

[25] *See* LR83.2.4 ("This court hereby adopts the Rules of Professional Conduct of the Louisiana State Bar Association, as hereafter amended from time to time by the Louisiana Supreme Court, except as otherwise provided by a specific rule of the courts.").

prescription, ethicists sometimes advise lawyers to protect the client (such as by filing suit to preserve rights) first, and to worry about withdrawal afterwards. That is effectively what Mr. Reynaud did.

## VII.  <u>Conclusion</u>

This memorandum ends where it began.  To the extent that the additional, nine-month suspension he is currently serving is based on any concern other than the filing of faulty complaints, there would be no factual basis for the extension.  On the other hand, if it is limited to his appearance as signatory on inaccurate complaints, Mr. Reynaud has already: (1) been sanctioned under Rule 11 on multiple occasions; and (2) served a 90-day suspension. For all of these reasons, Mr. Reynaud respectfully requests that the Order imposing the extended, nine-month suspension be vacated and that he be reinstated to practice in this Court.

Dated: July 28, 2023

Respectfully Submitted,

THE GALANTE LITIGATION GROUP, LLC

<u>/s/ William M. Ross</u>
WILLIAM M. ROSS (#27064)
SCOTT M. GALANTE, T.A. (#26890)
816 Cadiz Street
New Orleans, Louisiana 70115
Phone: (504) 203-5010
scott@galantelitigation.com
billy@galantelitigation.com

*Attorneys for Claude F. Reynaud, III*

UNITED STATES DITROCT COURT
WESTERN DISTRICT OF LOUISIANA

IN RE: ATTORNEYS OF            CASE NO. 3:23-MC-0062
MCCLENNY MOSELEY & ASSOCIATES
PLLC

**JUDGE TERRY A. DOUGHTY**

## VERIFICATION

**STATE OF LOUISIANA**

**PARISH OF ORLEANS**

Before me, the undersigned authority, duly commissioned in and for the State and Parish

aforesaid, came and appeared:

## CLAUDE F. REYNAUD, III

who, after being sworn, deposed and stated that he has reviewed the foregoing pre-hearing

memorandum and that the factual statements therein are true to the best of his knowledge,

information, and belief.

_____
Claude F. Reynaud, III

Sworn to and subscribed before me
this _2-4th_ day of July, 2023.

_____
Notary Public
Print Name: _William M. Ross_
La. Bar Roll No.: _27064_

My commission is for life.

 Gmail

**Claude Reynaud <creynaud3@gmail.com>**

---

## ACCEPTED Written Offer of Employment

**Claude Reynaud** <creynaud3@gmail.com>                                        Wed, Sep 22, 2021 at 3:05 PM
To: Colette@mma-pllc.com, Zach@mma-pllc.com, James@mma-pllc.com
Cc: william@mma-pllc.com

Hi Zach, James and Collete,

Per my conversations with Zach earlier today, attached for your records and review is my signed and slightly modified offer letter and contract of employment, formally accepting your offer as modified in the attached.

Specifically, per my conversations with Zach earlier, I've made the following changes and initialed the same:

First, I've changed my title from "Associate Attorney" to "Partner" (or if that doesn't go over well enough, alternatively, "Special Counsel"), which is a change in title only; it does in any way create a partnership or a partnership agreement and does not affect any other terms of the employment or employment contract as set forth in the attached agreement. As I discussed with Zach, this is, simply put, for business and marketing purposes only, as the title of "Partner," as opposed to "Associate," will make it a WHOLE lot easier for me to market myself, generate business, handle files, and negotiate settlements with perceived authority in the Louisiana market.  My professional and legal experience should also justify this moniker.

Second, per my discussions with Zach, I've changed the start date from Sept. 27, 2021 to Oct. 7, 2021, as I need to give my current employer at least 2 weeks notice.  That said, and as I mentioned to Zach, I've actually already started working to generate business and claim files--mostly commercial stuff so far--and will continue to do so up through and beyond this official start date.

Let me know if these changes are acceptable.

I am genuinely thrilled to begin.working with everyone here and can't wait to meet each of you in person!

Thanks!

Claude

**Claude F. Reynaud III**
9 Killdeer Street
New Orleans, LA 70124

*Cell:* (225) 241-1804

*Email:* creynaud3@gmail.com

---

📄 **Scan - 2021-09-22 12.04.15.pdf**
   7545K



Exhibit 1

23-30671.394

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: ATTORNEYS OF MCCLENNY | § | CASE NO 3:23-MC-0062 |
| MOSELEY & ASSOCIATES, PLLC | § | |
| | § | JUDGE TERRY A. DOUGHTY |
| | § | |
| | § | |

---

## AFFIDAVIT OF MELANIE FARRELL

---

STATE OF LOUISIANA

PARISH OF JEFFERSON

  **BEFORE ME**, the undersigned Notary Public, duly commissioned and qualified in and for the above-listed Parish and State, personally came and appeared:

### MELANIE FARRELL,

a capable person of the full age of majority, and both a resident and a domiciliary of the State of Louisiana, who, after being first duly sworn, did depose, state, and confirm under oath as follows:

1.  I, the above-named and undersigned affiant, Ms. Melanie Farrell ("Affiant" and/or "Ms. Farrell"), am of sufficient age, mind, capacity, and competence, and have sufficient personal knowledge and information to testify herein under oath as to the facts and events stated and described herein, all of which is based upon my own personal knowledge.

2.  I have been licensed and employed as a legal paralegal in the New Orleans metropolitan area for roughly 20 years, and prior to that, I worked as legal assistant for roughly 8 years. During the course of my entire career, I have worked for multiple large defense firms and three different plaintiff firms.

3.  I am currently a litigation paralegal with the firm of CHEHARDY, SHERMAN, WILLIAMS, RECILE & HAYES, LLP, located in Metairie, LA.

4.  At all times relevant to this matter, I was employed by MCCLENNY MOSELEY & ASSOCIATES, PLLC ("MMA"), where I worked out of MMA's New Orleans office as the firm's head litigation paralegal.

<div style="border:2px solid blue; display:inline-block; padding:10px;">Exhibit 2</div>

*Affidavit*
23-30671.305

5. I was hired by MMA in August of 2021 and worked there for roughly eighteen (18) months before ultimately resigning from MMA, effective immediately, on March 4, 2023.

6. Part of my primary duties and responsibilities as the head litigation paralegal during my time at MMA included working closely with Claude F. Reynaud III ("Mr. Reynaud") on a daily basis on *all files already in litigation*. As explained in more detail below, since the beginning of his employment at MMA, Mr. Reynaud primarily only handled matters that were *already in litigation*.

7. The firm was divided into departments as follows: Pre-Litigation, Estimates, Escalation calls from clients, Mediation, Litigation, and Accounting and Human Resources. MMA's Louisiana Managing Partner, William R. Huye III, was in charge of hiring, firing, and assigning employees to <u>all</u> of the different departments within the firm, implementing and creating work-flow processes for <u>all</u> departments, marketing, and general management.

8. According to Mr. Huye's plan for Mr. Reynaud, of which I was personally aware, Mr. Reynaud's defined, limited role at MMA was specifically to handle cases only once they were filed in court.

9. MMA opened its New Orleans office in late December 2021.

10. Based on my own personal knowledge and observations, Mr. Reynaud's responsibilities at MMA only began *once lawsuits were filed* with the courts. That is, Mr. Reynaud was never assigned to handle any specific MMA case or work with any MMA client *until a lawsuit was filed and a specific, substantive litigation issue arose* that required his immediate attention, including, *e.g.*, depositions, written discovery, drafting and filing motions and opposing memoranda, and trial preparation.

11. To the best of my knowledge, Mr. Reynaud was never invited to participate, and never participated, in any management roles or partnership meetings, nor did he have any role in the managerial functions of MMA or MMA's New Orleans office.

12. Based on my personal observations and conversations with Mr. Huye, I know that Mr. Huye deliberately excluded Mr. Reynaud from all partner and management meetings. Mr. Huye wanted Mr. Reynaud to focus on litigation and not work on or do anything else, including communicating with clients.

13. To the best of my knowledge, Mr. Reynaud was never involved in any of MMA's marketing efforts, client intake, drafting or sending the letters of representation to insurers, estimator assignments, general correspondence with insurers or clients prior to suit being filed, paying estimators or other vendors, documenting case expenses, handling settlement proceeds, accounting, or check processing; all of these areas were handled by Mr. Huye and/or others at MMA at the direction of Mr. Huye.

14. To the best of my knowledge, Mr. Reynaud did not receive or endorse settlement checks at MMA or ever have the authority or responsibility to do so.

15. Mr. Reynaud had no involvement, participation or input in the documentation of case expenses for clients. That was handled by Mr. Huye and/or others at MMA at the direction of Mr. Huye.

16. Based on my own personal knowledge and observations, I know for a fact that Mr. Reynaud had no interactions with any aspect of the firm's administrative or managerial functions, including, but not limited to, accounting and marketing. It was solely Mr. Huye's responsibility as the Louisiana Managing Partner to handle all administrative issues, particularly as relating to MMA's New Orleans, LA office.

17. To the best of my knowledge, had no part or involvement with MMA's contractual or working relationships with Apex or Velawcity.

18. With regard to Apex, there were filtering restrictions or security protocols put in place in MMA's case management software ("SmartAdvocate") such that any client or claim involving Apex was prohibited from being, handled or dealt with by anyone other than Mr. Huye or Mr. Huye's or Mr. Huye's selected paralegal for these purposes, Ms. Katy Ohlsson. No other person, other than Mr. Huye, was allowed to speak to Apex.

19. Mr. Huye, was designated internally as the, primary "handling" or responsible attorney on all Louisiana client files.

20. Mr. Reynaud was the only attorney at MMA who had both his work number *and his cell phone number* listed publicly on the firm website. Mr. Reynaud did this because, as he told me on multiple occasions, it was imperative to him that MMA's clients be able to get in touch with an attorney when needed.

21. Mr. Reynaud was instructed repeatedly by Mr. Huye not to speak to any of the clients to whom he was not directly assigned; his exact words to Mr. Reynaud, which I heard on multiple occasions, were that Mr. Reynaud's "time was too valuable" to speak to clients. Mr. Reynaud, however, ignored that directive and regularly fielded telephone calls from clients, most of whom he had never before spoken to, but who would call Mr. Reynaud on his cell phone.

22. With regard to the lawsuits filed by MMA relating to Hurricanes Laura and Delta, in the Summer of 2022, Mr. Huye advised me of his plan to prepare what he estimated to be roughly 100-150 lawsuits that would need to be filed in this Court relating to Hurricanes Laura and Delta, and that each such lawsuit would need to be filed against a named insurance carrier on behalf of multiple different similarly situated plaintiffs joined together using the procedure of permissive joinder. Based on my multiple conversations with him,

Mr. Huye's plan was he would be the only signatory and electronic filer for each of these lawsuits.

23. The first of these complaints was filed with this Court on or about Friday, August 12, 2022 in the matter of *Bacarisse, et al. v. State Farm Fire & Casualty Co.*, Suit No. 2:22-cv-03035. A week later, however, on or about Friday, August 19, 2022, the Court rejected this initial filing on the grounds that permissive joinder could not be invoked, and instead, ordered that separate lawsuits would need to be filed on behalf of each individual plaintiff. This turn of events caused a crisis in MMA's New Orleans office, as Mr. Huye began formulating a new plan that would allow MMA to prepare and file with this Court a massive number of separate Hurricane Laura lawsuits all within a single week so as to be filed prior to the prescriptive period deadline for Hurricane Laura claims.

24. Shortly thereafter, Mr. Huye announced to the MMA staff (me included) that his new plan was to file with this Court roughly 1,500 lawsuits all within the coming week and that he alone would still be the signatory and electronic filer for each of these 1,000+ lawsuits.

25. However, it soon became clear that, given the length of time it takes to upload and file a complaint citation using PACER, there was not enough time prior to the prescriptive deadline for all of the complaints to be filed using *only one* PACER account. That is, Mr. Huye determined that it would be possible for MMA to file all of the lawsuits prior to the prescriptive deadline *only* if a team of MMA staff members worked around the clock using *multiple* PACER accounts to file the lawsuits; otherwise, Mr. Huye explained, a substantial number of lawsuits would not be able to be filed and the clients' claims would prescribe.

26. Accordingly, on or about Monday, August 22, 2022, Mr. Huye notified the entire MMA staff of paralegals and legal assistants, me included, that the new plan was that a team of MMA staff members would be assigned to electronically file with this Court roughly 1,500 lawsuits over the course of that week, and that in order to do accomplish this, we would be provided access to the PACER accounts of all four (4) attorneys in the New Orleans office, namely, Mr. Huye, Cameron Snowden, Mr. Reynaud, and Grant Gardiner.

27. I personally observed Mr. Huye assure Mr. Reynaud (and several others at MMA) that all information to be inserted and alleged in the lawsuits—including, *e.g.*, the defendant insurance company, date of loss, loss address, and policy number—had been verified to best of his knowledge and ability based on information or documentation from the clients, from the insurance companies, or from a combination of both.

28. Over the course of the next week, the assigned team of staff members worked continuously using *all four* PACER accounts to file roughly 1,600 Hurricane Laura lawsuits with this Court.

29.    Following the hearing before Magistrate Judge Michael B. North on February 1, 2023, in *Franatovich v. Allied Trust Insurance Co.*, Suit No. 2:22-cv-02552-LMA-MBN (E.D. La. 2022), which was attended by William Huye and Zach Moseley, Mr. Huye represented to MMA's New Orleans office that the hearing had gone well, and that his arguments had been well received by Judge North.

30.    On Friday, February 17, 2023, I received and reviewed the "Cease & Desist" letter and Notice of Investigation that had been issued that day to MMA and to Mr. Huye, Zach Moseley, and James McClenny, by the Louisiana Department of Insurance ("LDI"). Mr. Huye assured the MMA New Orleans office, that the allegations set forth in the LDI Letter were either completely untrue or otherwise taken out of context and that nothing would come of it, since the entire thing was "politically motivated."

31.    On or about Tuesday, February 28, 2023, Mr. Reynaud told me that he would soon be leaving MMA and forming his own firm with Mr. Gardiner and Katie Aromi.

32.    I resigned from MMA on March 4, 2023, effective immediately, along with Mr. Gardiner, Mr. Reynaud and Ms. Aromi.

33.    Affiant attests that everything stated and contained herein in this Affidavit is true, correct, and accurate to the very best of her personal knowledge, information, and belief.

*Further Affiant Sayeth Not.*

**MELANIE FARRELL (*Affiant*)**

        **SWORN TO AND SUBSCRIBED** before me, the undersigned Notary Public, this 27th day of ___July___, 2023.

                                            NOTARY PUBLIC

                Printed Name: _____

                La. Bar Roll No. _____

                Commission Expires: _____

                    Matthew A. Sherman
                    NOTARY PUBLIC
                    State of Louisiana
            La. Bar Roll No: 32687/ID-No: 138507
            My Commission is Issued for Life

*Affidavit*
23-30671.309



## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: ATTORNEYS OF MCCLENNY | § | CASE NO 3:23-MC-0062 |
| MOSELEY & ASSOCIATES, PLLC | § | |
| | § | JUDGE TERRY A. DOUGHTY |
| | § | |
| | § | |

## AFFIDAVIT OF HEATHER MELAAS

STATE OF COLORADO

COUNTY OF DOUGLAS

     **BEFORE ME**, the undersigned Notary Public, duly commissioned and qualified in and

for the above-listed County and State, personally came and appeared:

### HEATHER MELAAS,

a capable person of the full age of majority, and both a resident and a domiciliary of the State of

Colorado, who, after being first duly sworn, did depose, state, and confirm under oath as follows:

1.    I, the above-named and undersigned affiant, Ms. Heather Melaas ("Affiant" and/or "Ms. Melaas"), am of sufficient age, mind, capacity, and competence, and have sufficient personal knowledge and information to testify herein under oath as to the facts and events stated and described herein, all of which is based upon my own personal knowledge.

2.    I am currently licensed to practice law in the States of Colorado, Texas, and Florida.

3.    At all times relevant to this matter, I was employed by MCCLENNY MOSELEY & ASSOCIATES, PLLC ("MMA"), where I worked remotely out of MMA's Houston, TX office as one of the firm's non-equity partners.

4.    I was hired by MMA on October 2, 2017 and worked there for roughly five (5) years and seven (7) months before ultimately resigning on April 27, 2023, with my last day with the firm being May 12, 2023.

Exhibit 3

**23-30671.311**

5.  During my time at MMA, my duties and responsibilities as a non-equity partner included handling my own docket of cases assigned to me within the jurisdictions in which I was licensed, including in the States of Texas, Colorado, and Florida.

6.  To the best of my recollection, Mr. Claude F. Reynaud III ("Mr. Reynaud") was hired by MMA in September 2021, shortly after Hurricane Ida, specifically to help with the litigation of hurricane cases in the State of Louisiana once lawsuits were filed with the courts. Based on my own personal conversations with MMA's Louisiana Managing Partner, R. William Huye III ("Mr. Huye"), my understanding was that Mr. Huye hired Mr. Reynaud with the specific intent of having Mr. Reynaud only handle cases once they were filed in court and a specific, substantive litigation issue arose.

7.  Based on my own personal knowledge and my intimate dealings with MMA's case management software ("SmartAdvocate"), I know that Mr. Huye was designated internally as the lone, primary "handling" or responsible attorney on all Louisiana client files.

8.  To the best of my knowledge, and based on my multiple conversations with Mr. Huye regarding the division of responsibilities within the MMA New Orleans office, during his time at MMA, Mr. Reynaud never handled any specific MMA case or worked directly with any MMA client unless and until a lawsuit was filed and a specific, substantive litigation issue or legal proceeding arose that required his immediate attention, including, *e.g.*, depositions, written discovery, motion practice, and/or preparing for trial.

9.  To the best of my knowledge, despite being listed as a "partner" on the MMA website, Mr. Reynaud did not have any actual partnership or equity interest in MMA and was never involved and/or consulted in any way relating to the management of MMA. Mr. Reynaud did not have any voting rights or decision-making authority on behalf of the firm, nor did he ever have any role or play any part in any of the managerial or executive functions of MMA or MMA's New Orleans office.

10. Based on my own personal observations, Mr. Reynaud was tasked with an overwhelming docket of litigation cases, yet always did what was in his power to zealously advocate for the clients and always put a premium on doing what was best for the clients' interests.

11. During the time I shared at MMA with Mr. Reynaud, I regularly attended, via Zoom, MMA's weekly "executive meetings" along with several other attorneys, managers, and principals of MMA. I cannot recall Mr. Reynaud ever attending one of these meetings. In

fact, to the best of my knowledge, Mr. Reynaud was never invited to participate, and never did participate, in any management or executive roles or partnership meetings, and he never had any role or played any part in any of the managerial functions of MMA or MMA's New Orleans office.

12.    To the best of my knowledge, Mr. Reynaud was never involved in, and was never given any responsibility for, any of MMA's marketing or client-acquisition efforts and had no part or involvement whatsoever with MMA's contractual or working relationships with either Apex or Velawcity.

13.    To the best of my knowledge, Mr. Reynaud never once received or endorsed any settlement checks at MMA and never once had the authority or responsibility to do so.  Based on my own personal knowledge, I also know that Mr. Reynaud had no participation or involvement in, nor did he have any access to, the receiving, processing, handling, or disbursement of any settlement checks or settlement proceeds.

14.    Mr. Reynaud did not have access to any of MMA's financial and/or banking records, was not a signor on any of the accounts with the firm's financial institutions, and had no involvement in the accounting aspect of MMA's operations.

15.    Affiant attests that everything stated and contained herein in this Affidavit is true, correct, and accurate to the very best of her personal knowledge, information, and belief.

*Further Affiant Sayeth Not.*

**HEATHER MELAAS (*Affiant*)**

**SWORN TO AND SUBSCRIBED** before me, the undersigned Notary Public, this 27ᵗʰ day of July , 2023.

NOTARY PUBLIC

Printed Name: Michael Kemp
Notary ID
CO Bar Roll No.  20224026173
Commission Expires: 7/5/26

MICHAEL ADAM KEMP
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20224026173
MY COMMISSION EXPIRES JULY 5, 2026

23-30671.313



**R. Kyle Ardoin**
**Secretary of State**

# ARTICLES OF ORGANIZATION
(R.S. 12:1301)

| | |
|---|---|
| **Domestic Limited Liability Company**<br>Enclose $100 filing fee<br>Make remittance payable to<br>Secretary of State<br>*Do not send cash* | **Return to: Commercial Division**<br>P. O. Box 94125<br>Baton Rouge, LA 70804-9125<br>(225) 925-4704<br>www.sos.la.gov |

STATE OF _Louisiana_

PARISH/COUNTY OF _Jefferson_

1. The name of this limited liability company is : _Reynaud Gardiner, LLC_

2. This company is formed for the purpose of: (check one)

( ✓ )   Engaging in any lawful activity for which limited liability companies may be formed.

( )   _____
(use for limiting activity)

3. The duration of this limited liability company is : (may be perpetual)  _Perpetual_

4. Other provisions:  _Claude F. Reynaud III 45%_
   _Grant P. Gardiner – 45%_
   ~~(text)~~
   _Kathleen Aromi Brandner – ~~(text)~~_
                              _10%_

Signatures:

On this _3rd_ day of _March_ , 20_23_ before me, personally appeared

_Grant Gardiner, Claude Reynaud, Katie Aromi_ to me known to be the person described in and who

executed the foregoing instrument, and acknowledged that he/she executed it as his/her free act and deed.

**NOTARY NAME MUST BE TYPED OR PRINTED WITH NOTARY #**     Shannon S. Frese
                                                          NOTARY PUBLIC
_____                                   La. Bar No. 29867, La. Notary No. 87677
Notary Signature                                          My Commission is for Life.

SS365 Rev. 05/18

Exhibit 4

(See Instructions on
back)

23-30671-313



**R. Kyle Ardoin**
**Secretary of State**

### LIMITED LIABILITY COMPANY INITIAL REPORT
(R.S. 12:1305 (E))

1. The name of this limited liability company is: _Reynaud Gardiner, LLC_

2. The location and municipal address, not a post office box only, of this limited liability company's registered office:
   _2908 Hessmer Ave., Metairie, LA 70002_

3. The full name and municipal address, not a post office box only, of each of this limited liability company's registered agent(s) is/are:
   _Claude F. Reynaud, III_
   _2908 Hessmer Ave., Metairie, LA 70002_

4. The names and municipal addresses, not a post office box only, of the first managers, or the members:
   _Claude F. Reynaud, III : 2908 Hessmer Ave., Metairie, LA 70002_
   _Grant P. Gardiner : 2908 Hessmer Ave., Metairie, LA 70002_
   _Kathleen Aromi Brandner : 2908 Hessmer Ave., Metairie, LA 70002_

   To be signed by each person who signed the articles of organization:

### AGENT'S AFFIDAVIT AND ACKNOWLEDGEMENT OF ACCEPTANCE

I hereby acknowledge and accept the appointment of registered agent for and on behalf of the above named limited liability company.

Registered agent(s) signature(s):

_CLAUDE F. REYNAUD III_

Sworn to and subscribed before me, the undersigned Notary Public, on this date: _3/3/23_

NOTARY NAME MUST BE TYPED OR PRINTED WITH NOTARY #

Notary Signature

Shannon S. Frese
NOTARY PUBLIC
La. Bar No. 29867, La. Notary No. 8767
My Commission is for Life.

SS973 Rev. 05/18                                                  (see instructions) 201-30671.315

R. Kyle Ardoin
SECRETARY OF STATE

STATE OF LOUISIANA
SECRETARY OF STATE

## TRANSMITTAL INFORMATION
## For All Business Filings

---

### Please indicate below the level of service requested, payment and contact information

☐ Routine       ☐ Expedite $30          ☐ Priority Expedite $50
                     *24 hour processing*        *2-4 hour processing*

☐ Check or Money Order Enclosed

*Do not put credit card information on this form. You may save payment information in your geauxBIZ profile under master account.

Reynaud Gardiner, LLC
Business Name (List **exactly** as it appears in documents)

Grant Gardiner
Name of person filing document (evidence of filing will be mailed to this person, at address below)

6739 Argonne Blvd.
Address

New Orleans          LA              70124
City                          State                   Zip Code

(225) 302-2531                            grantpgardiner@gmail.com
Daytime phone number           Fax number              Email address

**NOTE: Louisiana Law requires all Louisiana notaries to print or type their name and notary or
bar roll number on the document.**

Mailing Address: P. O. Box 94125, Baton Rouge, LA * 70804-9125
Office Location: 8585 Archives Ave., Baton Rouge, LA * 70809
Web Site Address:  www.sos.la.gov

SS984 Rev. 06/18

23-30671.316

Tab 8

01:33PM   1        going to call my client now.  He's going to talk
01:33PM   2        directly about his experience.  So at this time I call
01:33PM   3        Claude Reynaud, III.
01:33PM   4                    **CLAUDE F. REYNAUD, III,**
01:33PM   5    after being first duly cautioned and sworn to tell the truth,
01:33PM   6    the whole truth and nothing but the truth, did testify on
01:33PM   7    oath as follows.
01:33PM   8        MR. GALANTE:  Mr. Reynaud, I believe the Court
01:33PM   9        knows you; but if you could introduce yourself for the
01:33PM   10       record.
01:33PM   11       MR. REYNAUD:  Your Honor, good afternoon.  Thank
01:33PM   12       you for having me, first of all.  Thank you for allowing
01:34PM   13       this hearing to occur.  Before we start I just wanted
01:34PM   14       to kind of reiterate what my colleagues or former
01:34PM   15       colleagues said on the record previously which is -- or
01:34PM   16       in my own words.  I've never been this embarrassed my
01:34PM   17       whole life.  I am so sorry and apologetic that my role
01:34PM   18       at this firm has caused any heartache or headache to
01:34PM   19       this Court or to the people of this district.  Again, I
01:34PM   20       just can't make anybody understand how embarrassed I am
01:34PM   21       at this point and so regretful that I ever participated
01:34PM   22       at this firm or worked for this firm.  It's caused me
01:34PM   23       all sorts of personal and professional issues and will
01:34PM   24       continue for time -- foreseeable future.  And I just
01:34PM   25       wanted to reiterate that I apologize to this Court for

01:34PM   1      my role at MMA.
01:35PM   2             THE COURT:  Thank you.
01:35PM   3             MR. GALANTE:  Before we get started fully, also,
01:35PM   4      I'd like you to tell the Court a little bit about your
01:35PM   5      current or intended relationship with either any case --
01:35PM   6             MR. REYNAUD:  Right.
01:35PM   7             MR. GALANTE:  -- that you handled in the Western
01:35PM   8      District for MMA or any fees that may be --
01:35PM   9             MR. REYNAUD:  Yeah.  So as similar to my former
01:35PM  10      colleagues who testified earlier today, I have no
01:35PM  11      interest in any cases currently before this Court.  I
01:35PM  12      have no intent on seeking any interest in any cases or
01:35PM  13      any fees from any cases.  I do not want to practice in
01:35PM  14      this court on any of these cases.  I do not intend on
01:35PM  15      representing any former MMA clients in this court.  I
01:35PM  16      would, as much as I can, be completely distanced from
01:35PM  17      that set of clients before this court.
01:35PM  18             MR. GALANTE:  Claude, would you tell the Court a
01:35PM  19      little bit about your story, where you're from.
01:35PM  20             MR. REYNAUD:  I am -- was born and raised in Baton
01:35PM  21      Rouge, Louisiana.  I attended University of Virginia for
01:36PM  22      college, came back to New Orleans and went to Tulane
01:36PM  23      University.  From that point forward I was a defense
01:36PM  24      attorney for 12 to 13 years mostly working on commercial
01:36PM  25      litigation, and then towards the end of that tenure I

01:36PM  1    worked insurance defense.

01:36PM  2         MR. GALANTE:  And at any time during that, you say,

01:36PM  3    12 to 13 year period where you essentially were doing

01:36PM  4    defense work were you working on insurance claims of any

01:36PM  5    kind for plaintiffs?

01:36PM  6         MR. REYNAUD:  No, I was not.

01:36PM  7         MR. GALANTE:  Was this a new experience for you?

01:36PM  8         MR. REYNAUD:  This was a brand-new experience for

01:36PM  9    me.

01:36PM  10        MR. GALANTE:  How did you find your way to MMA?

01:36PM  11        MR. REYNAUD:  Well, the time right before Hurricane

01:36PM  12   Ida I was working at a firm that was dealing with some

01:36PM  13   insurance defense and I felt that I could really be an

01:36PM  14   asset to the plaintiffs and the policyholders of this

01:36PM  15   state, to represent them on that side of the aisle.

01:36PM  16   Given what I knew about the insurance industry and the

01:36PM  17   practices that I was seeing firsthand, I felt that I

01:36PM  18   could really help out policyholders and protect their

01:37PM  19   claims.  So when Hurricane Ida hit, that's when I

01:37PM  20   decided to explore my options to see if there was any

01:37PM  21   plaintiffs firms out there that might be hiring.  And I

01:37PM  22   knew William Huye from previously working against him

01:37PM  23   when he was at Pandit Law, and we'd settled or mediated

01:37PM  24   cases against one another before previously.  So I

01:37PM  25   reached out to him or he reached out to me, I can't

01:37PM  1      remember which way it was, but he said, "There's a job
01:37PM  2      here if you'd like to do it," and I jumped on it.  He
01:37PM  3      paid me a salary of 120,000 a year, and that was roughly
01:37PM  4      what I was making at my current position and I accepted
01:37PM  5      it.
01:37PM  6           MR. GALANTE:  Just as an aside, you heard the Court
01:37PM  7      mention his understanding some lawyers were making
01:37PM  8      upwards of half a million dollars.  Did you ever make
01:37PM  9      anything close to that?
01:37PM  10          MR. REYNAUD:  No, never in my life have I.
01:37PM  11          MR. GALANTE:  So this sounds like it's around the
01:37PM  12     year September 2021 -- excuse me, September 2020.
01:38PM  13          MR. REYNAUD:  September 2020, yes.  No, no,
01:38PM  14     September 2021.
01:38PM  15          MR. GALANTE:  I apologize.  So you went to work at
01:38PM  16     MMA in September of 2021?
01:38PM  17          MR. REYNAUD:  Correct.
01:38PM  18          MR. GALANTE:  Tell the Court a little bit about
01:38PM  19     what your experience was as an attorney at MMA when you
01:38PM  20     started there.
01:38PM  21          MR. REYNAUD:  Well, when I first started there,
01:38PM  22     there were not that many people at MMA and there was not
01:38PM  23     even an office in Louisiana for MMA.  Cameron was there,
01:38PM  24     Mr. Snowden who testified earlier.  William was there.
01:38PM  25     Melanie Farrell was there.  She was William's paralegal.

01:38PM   1        There was a couple of attorneys or, if they were not

01:38PM   2    attorneys, may have been clerks working for William who

01:38PM   3    I never really got to know.  But there was a team of

01:38PM   4    people that were communicating with William, but I never

01:38PM   5    really met them extensively.  Mostly a lot of it was

01:38PM   6    because we never really had an office until December

01:38PM   7    of 2021.  During that time, from September to December

01:38PM   8    2021, I worked from my house and mostly tried to drum up

01:39PM   9    business as best I could by calling my family and

01:39PM  10    friends and letting them know what I was doing.

01:39PM  11        MR. GALANTE:  We now know MMA had an influx of

01:39PM  12    literally thousands of cases over a period of time; but

01:39PM  13    before the office opened in New Orleans, was there that

01:39PM  14    kind of influx of cases happening?

01:39PM  15        MR. REYNAUD:  Not to my knowledge, no.  I would

01:39PM  16    be -- no, I don't think so.

01:39PM  17        MR. GALANTE:  And a better question:  What were the

01:39PM  18    numbers of cases you were assigned like?

01:39PM  19        MR. REYNAUD:  Well, initially during the period

01:39PM  20    when I was working from home I really wasn't assigned

01:39PM  21    any cases except for the cases I was trying to -- I was

01:39PM  22    really doing mostly business development at that point.

01:39PM  23    In those months I went to a couple of events where I --

01:39PM  24    where we gave free information and that sort of thing,

01:39PM  25    and I never got clients from that but I learned how to

| | | |
|---|---|---|
| 01:39PM | 1 | be a plaintiffs attorney.  I thought that was what you |
| 01:39PM | 2 | do, is you go out there and you get your name out and |
| 01:39PM | 3 | tell people what you're doing.  I did sign a few clients |
| 01:40PM | 4 | in that period, but I never really litigated those |
| 01:40PM | 5 | clients until I started working at the office starting |
| 01:40PM | 6 | in December or January of 2023. |
| 01:40PM | 7 | THE COURT:  So you say client development. |
| 01:40PM | 8 | MR. REYNAUD:  Yes, sir. |
| 01:40PM | 9 | THE COURT:  You'd go to these events? |
| 01:40PM | 10 | MR. REYNAUD:  Yes, sir. |
| 01:40PM | 11 | THE COURT:  Who are at these events? |
| 01:40PM | 12 | MR. REYNAUD:  Well, for instance, this was one |
| 01:40PM | 13 | event, like, my neighborhood had a town hall meeting for |
| 01:40PM | 14 | just the neighbors and I went there and I gave them |
| 01:40PM | 15 | information about what to do to protect their claims. |
| 01:40PM | 16 | THE COURT:  Okay.  Did you ever go to any trade |
| 01:40PM | 17 | shows, people in the disaster business? |
| 01:40PM | 18 | MR. REYNAUD:  I did go to one trade show but only |
| 01:40PM | 19 | as a guest of William Huye and I didn't speak or do |
| 01:40PM | 20 | anything like that. |
| 01:40PM | 21 | THE COURT:  And what was Mr. Huye doing there? |
| 01:40PM | 22 | MR. REYNAUD:  He spoke at a panel.  It was at the |
| 01:40PM | 23 | Superdome.  I think it was a garden show.  And he spoke |
| 01:40PM | 24 | at a panel with other plaintiffs attorneys in the area, |
| 01:40PM | 25 | Galen Hair being one of them, I remember him, and just |

23-30671.801

01:41PM  1      kind of the same thing, about how to protect your

01:41PM  2      claims.

01:41PM  3            THE COURT:  I've seen videos online.  I don't

01:41PM  4      really do technology, but I've seen some videos online

01:41PM  5      of people from your firm at these trade shows with

01:41PM  6      mitigation companies, roofing companies, socializing

01:41PM  7      and, I'm assuming, trying to develop relationships with

01:41PM  8      them to refer clients to them --

01:41PM  9            MR. REYNAUD:  Right.  I never --

01:41PM  10           THE COURT:  -- which got you-all in trouble in the

01:41PM  11     Eastern District with Apex Roofing.

01:41PM  12           MR. REYNAUD:  That's my understanding as well.  I

01:41PM  13     never attended one of those.

01:41PM  14           THE COURT:  You never attended, but did you know

01:41PM  15     they were attending those types of events?

01:41PM  16           MR. REYNAUD:  I can't say that I did, honestly.  I

01:41PM  17     knew they existed and I did know William -- Mr. Huye was

01:41PM  18     attending, but I didn't know the extent to which he was

01:41PM  19     doing it.  No, sir.

01:41PM  20           MR. GALANTE:  So it was during this period -- and

01:41PM  21     let me start by saying at all times when you worked at

01:41PM  22     MMA you were an employee associate of the firm; is that

01:42PM  23     right?

01:42PM  24           MR. REYNAUD:  Yes.  Well, no, no.  I'm sorry.  When

01:42PM  25     I was at MMA?

01:42PM  1          MR. GALANTE:  Yes.

01:42PM  2          MR. REYNAUD:  I was a titled partner.

01:42PM  3          MR. GALANTE:  That's what I was getting at.

01:42PM  4          MR. REYNAUD:  Yeah, yeah, yeah.

01:42PM  5          MR. GALANTE:  I think we've attached it to the

01:42PM  6     brief.  There's an electronic mail where you requested

01:42PM  7     the title of partner?

01:42PM  8          MR. REYNAUD:  Correct.  Correct.

01:42PM  9          MR. GALANTE:  But you weren't a partner in the law

01:42PM  10    firm?

01:42PM  11         MR. REYNAUD:  No.  I was an employee.  I was a

01:42PM  12    partner in title only.  My title on the website was

01:42PM  13    partner, but it was really for business development

01:42PM  14    purposes to try to allow me to procure clients.

01:42PM  15         MR. GALANTE:  Sounds like in the first five or six

01:42PM  16    months you were responsible to find your own clients.

01:42PM  17         MR. REYNAUD:  That is correct.

01:42PM  18         MR. GALANTE:  When the office in New Orleans

01:42PM  19    opened, what happened then?

01:42PM  20         MR. REYNAUD:  When the office in New Orleans opened

01:42PM  21    I was handed a docket of roughly 14 to 15 cases that had

01:42PM  22    already been filed in this court and in state courts in

01:42PM  23    this area for Laura Delta, and I handled those cases

01:42PM  24    just like any other cases that I would have handled

01:43PM  25    previously to my time at MMA.  So, for instance, I

01:43PM    1     would -- did a lot of discovery.  I did some

01:43PM    2     depositions, motions to compel, actually settled a few

01:43PM    3     of those cases at mediation and took those cases -- I

01:43PM    4     think there was two that I settled at mediation and

01:43PM    5     those cases resolved that way.

01:43PM    6         MR. GALANTE:  Before we move on, are those the only

01:43PM    7     cases you ever settled while you were with MMA?

01:43PM    8         MR. REYNAUD:  Myself personally, yes.  I mean, I

01:43PM    9     attended mediations but I was always under the authority

01:43PM   10     of William and the others there.  I never was there

01:43PM   11     mediating cases by myself.

01:43PM   12         MR. GALANTE:  How often did you attend those

01:43PM   13     mediations?

01:43PM   14         MR. REYNAUD:  Not very often.  I can't remember.

01:43PM   15     Couple times, three times, maybe at the most.

01:43PM   16         THE COURT:  What were you hired to do?  I mean,

01:43PM   17     maybe I beat you to the question, but --

01:44PM   18         MR. GALANTE:  That's exactly where I was going.

01:44PM   19         THE COURT:  -- what are you hired to do then?

01:44PM   20         MR. REYNAUD:  My job as a lawyer at MMA was

01:44PM   21     strictly to litigate the cases once the lawsuits were

01:44PM   22     filed, to address the issues and the litigation issues

01:44PM   23     once they arose.  So any time a motion or exception or

01:44PM   24     anything like that was filed I would be handed or

01:44PM   25     assigned the case and address the memo or the pleading

01:44PM  1    on its own merits, usually by talking to the client and

01:44PM  2    usually by handling it all the way to the end of that or

01:44PM  3    the resolution of that pleading, whether it be a motion

01:44PM  4    for summary judgment or exception or otherwise.

01:44PM  5              THE COURT:  Go ahead.

01:44PM  6              MR. GALANTE:  You beat me to the punch but I

01:44PM  7    appreciate that, Your Honor.  Naturally where we're

01:44PM  8    going.

01:44PM  9         So you were hired and at all times were a

01:44PM 10    litigation attorney?

01:44PM 11              MR. REYNAUD:  That's correct, yes.

01:44PM 12              MR. GALANTE:  I've asked you about a few things, a

01:44PM 13    few mediations that you handled and those 15 suits that

01:44PM 14    you first got and then attending a few with Mr. Huye,

01:44PM 15    two or three I think you said.

01:44PM 16              MR. REYNAUD:  I hate to put a number on that.  I

01:45PM 17    mean, I went to MAPS a few times with them but always as

01:45PM 18    kind of a here's what we're doing mediation-wise so we

01:45PM 19    can show you what we're doing before it gets to the

01:45PM 20    litigation phase because that's exactly what I would be

01:45PM 21    needing to know and get a handle on the case before it

01:45PM 22    got to the litigation side.

01:45PM 23              MR. GALANTE:  So you were informed of where the

01:45PM 24    case was at.

01:45PM 25              MR. REYNAUD:  Correct.

01:45PM   1          MR. GALANTE:  Other than those activities you've

01:45PM   2     described, Claude, was there anything else

01:45PM   3     pre-litigation that you understood was your

01:45PM   4     responsibility at MMA while you were employed there?

01:45PM   5          MR. REYNAUD:  Pre-litigation, not that I can think

01:45PM   6     of offhand, no, I mean, other than my own clients that I

01:45PM   7     brought in.  I would talk to them on a very regular

01:45PM   8     basis.  In addition to that, I also talked to the

01:45PM   9     clients who would call my cell phone.  But other than

01:45PM  10     that, yes.

01:45PM  11          MR. GALANTE:  We're going to get to that.  I know

01:45PM  12     you want to talk to the Court about that.

01:45PM  13          MR. REYNAUD:  Okay.

01:45PM  14          MR. GALANTE:  We will.  So is it fair to say based

01:45PM  15     on your testimony that the entire responsibility you

01:45PM  16     understood you had was after a lawsuit was filed?

01:46PM  17          MR. REYNAUD:  That is correct, yes.

01:46PM  18          MR. GALANTE:  And to the extent that you handled

01:46PM  19     cases that had already been filed through, let's say,

01:46PM  20     into the summer of 2022, in your experience with those

01:46PM  21     cases, and again, I want to reiterate, you didn't file

01:46PM  22     those cases, did you?

01:46PM  23          MR. REYNAUD:  No.

01:46PM  24          MR. GALANTE:  But in your experience in those

01:46PM  25     cases, did the kinds of problems we now know have

01:46PM   1    erupted here in the Western District ever appear in

01:46PM   2    those cases?

01:46PM   3         MR. REYNAUD:  No.

01:46PM   4         MR. GALANTE:  And to be clear about that question,

01:46PM   5    did you ever have to handle the filing of any lawsuits

01:46PM   6    because the firm was under duress from a timeliness

01:46PM   7    standpoint, before we're going to get to what happened

01:46PM   8    here?

01:46PM   9         MR. REYNAUD:  No.  Before the Pacer filing fiasco,

01:46PM  10    no.

01:46PM  11         THE COURT:  But they used your Pacer account to

01:46PM  12    file them.

01:46PM  13         MR. REYNAUD:  That is correct.

01:46PM  14         MR. GALANTE:  That's right, Your Honor.  And I am

01:46PM  15    definitely going to focus on that particular week with

01:46PM  16    him as well.  I'm just trying to get some background on

01:47PM  17    what you understood your role was and what that role --

01:47PM  18         MR. REYNAUD:  Correct.

01:47PM  19         MR. GALANTE:  -- dictated your experience --

01:47PM  20         MR. REYNAUD:  Correct.

01:47PM  21         MR. GALANTE:  -- had been to that point.  And

01:47PM  22    there's been some mention made that in the summer of

01:47PM  23    2022, the late spring, early summer of 2022, it was

01:47PM  24    brought to your attention that maybe there was an issue

01:47PM  25    in the representation relationship between MMA and some

23-30671.807

| 01:47PM | 1 | of its clients. |
|---|---|---|

01:47PM  1    of its clients.

01:47PM  2        MR. REYNAUD:  Well, yes.  And before we go there, I

01:47PM  3    think -- what happened was as soon as I got to the

01:47PM  4    office I started working on my docket of cases for Laura

01:47PM  5    Delta; but soon after that Ida cases started trickling

01:47PM  6    in, mostly as a result of the defendant insurance

01:47PM  7    carrier having filed something or other likely to invoke

01:47PM  8    appraisal or to enforce appraisal and I would respond to

01:47PM  9    that.  In that particular context, as Mr. Galante points

01:47PM  10   out, it was brought to my attention that there was maybe

01:48PM  11   an issue as to whether MMA represents its clients.  And

01:48PM  12   there was 15 or so of these particular cases Allied

01:48PM  13   Trust was the insurance carrier and so --

01:48PM  14       THE COURT:  What raised this issue?  How was this

01:48PM  15   issue raised?

01:48PM  16       MR. REYNAUD:  Counsel for Allied Trust brought to

01:48PM  17   my attention he thought there may be a question as to

01:48PM  18   whether MMA represented the client it purported to

01:48PM  19   represent.  So what I did in response to that was

01:48PM  20   immediately go to each file that I was working on and

01:48PM  21   talking to the clients with, talked to the clients as

01:48PM  22   well.  I said, "Look, do we -- I want to make sure.  We

01:48PM  23   represent you, correct?  Correct."  Within the file

01:48PM  24   found a retainer agreement.  In each of these cases I

01:48PM  25   found a signed retainer agreement, talked with the

01:48PM    1          clients and was in communication with the clients

01:48PM    2          throughout this entire time.  And I offered to provide

01:48PM    3          to Allied Trust counsel these documents.

01:48PM    4                And after that happened, turns out Allied Trust

01:49PM    5          counsel was probably a lot more correct than I even

01:49PM    6          knew.  But Mr. Huye informed me or advised me at the

01:49PM    7          time that that was a fishing expedition, that he's just

01:49PM    8          trying to make noise, or whatever he said.  I can't

01:49PM    9          remember exactly.  So that satisfied me.  I looked at

01:49PM   10          the files.  I saw a retainer agreement in each case.

01:49PM   11          That was it for Apex until later on when I reappeared in

01:49PM   12          Your Honor's court.

01:49PM   13                MR. GALANTE:  I just want to make sure we're clear

01:49PM   14          on the context for the Court.  As we're hitting August,

01:49PM   15          we'll call it the fateful month of August 2022, to that

01:49PM   16          point, if I understand your testimony, you'd never been

01:49PM   17          given any reason to disbelieve the underlying facts in

01:49PM   18          any of the pleadings that you were litigating?

01:49PM   19                MR. REYNAUD:  No.

01:49PM   20                MR. GALANTE:  In fact, when defense counsel flagged

01:49PM   21          for you the potential there was a problem, you were able

01:49PM   22          to verify in those files it was not present?

01:49PM   23                MR. REYNAUD:  That is correct, yes.

01:49PM   24                MR. GALANTE:  And moreover, you were speaking with

01:50PM   25          those clients?

23-30671.809

01:50PM   1          MR. REYNAUD:  That is correct, yes.

01:50PM   2          MR. GALANTE:  Going into we're going to say the

01:50PM   3     middle of August 2022, can you estimate for the Court

01:50PM   4     about how many files at that point in litigation you

01:50PM   5     were handling, had responsibility for or otherwise

01:50PM   6     connected to?

01:50PM   7          MR. REYNAUD:  I would say upwards of 50 to 60 cases

01:50PM   8     including both Ida cases that had been initiated by the

01:50PM   9     defense or the insurance carriers and then some Laura

01:50PM   10    Delta -- excuse me, yeah, Laura Delta cases that

01:50PM   11    remained in addition to the cases that I brought in

01:50PM   12    myself that I was handling all by myself, and there was

01:50PM   13    roughly four or five of those.

01:50PM   14         MR. GALANTE:  I know this is an amorphous question,

01:50PM   15    but I'd like you to do your best to describe it.  What

01:50PM   16    was the atmosphere like working at MMA in the New

01:50PM   17    Orleans office during that period?

01:50PM   18         MR. REYNAUD:  During the period of summer 2022?

01:50PM   19         MR. GALANTE:  Yeah.

01:50PM   20         MR. REYNAUD:  It's a tough -- I was really working

01:50PM   21    so hard on litigating that I was inundated with

01:51PM   22    different types of motions and briefing and drafting all

01:51PM   23    day long.  That's all I did.  So I would go to the

01:51PM   24    office, I would do that all day, then I would leave.

01:51PM   25         MR. GALANTE:  Did you have the necessary support

01:51PM 1      staff to meet those obligations?

01:51PM 2          MR. REYNAUD:  I mean, I think so.  Melanie was

01:51PM 3      really good, my paralegal.  Other than her, though, in

01:51PM 4      hindsight, probably not.  We needed more attorneys, and

01:51PM 5      I always told William that.  And he always promised me,

01:51PM 6      in fact, that once we got to the litigation phase of all

01:51PM 7      these suits that were going to be filed we would have an

01:51PM 8      entire team of people, attorneys working these cases.

01:51PM 9          MR. GALANTE:  Is it fair to say things were getting

01:51PM 10     busier?

01:51PM 11         MR. REYNAUD:  They were.

01:51PM 12         MR. GALANTE:  And is it fair to say you were told

01:51PM 13     that they were going to ramp up that support?

01:51PM 14         MR. REYNAUD:  That is correct, yes, absolutely.

01:51PM 15         MR. GALANTE:  So, again, we know that parallel,

01:51PM 16     now, that MMA was bringing in a tremendous amount of new

01:51PM 17     clients and particularly in this district.  What was

01:51PM 18     your understanding of the onboarding of clients at that

01:52PM 19     point?  Were you involved in it, first?

01:52PM 20         MR. REYNAUD:  No, I was never involved in any

01:52PM 21     onboarding of clients or intake of clients or anything

01:52PM 22     in that -- relating to that.

01:52PM 23         MR. GALANTE:  Were you involved in any of the

01:52PM 24     marketing?

01:52PM 25         MR. REYNAUD:  No, absolutely not.

| | |
|---|---|
| 01:52PM | 1 |
| 01:52PM | 2 |
| 01:52PM | 3 |
| 01:52PM | 4 |
| 01:52PM | 5 |
| 01:52PM | 6 |
| 01:52PM | 7 |
| 01:52PM | 8 |
| 01:52PM | 9 |
| 01:52PM | 10 |
| 01:52PM | 11 |
| 01:52PM | 12 |
| 01:52PM | 13 |
| 01:52PM | 14 |
| 01:52PM | 15 |
| 01:52PM | 16 |
| 01:52PM | 17 |
| 01:52PM | 18 |
| 01:52PM | 19 |
| 01:52PM | 20 |
| 01:52PM | 21 |
| 01:52PM | 22 |
| 01:52PM | 23 |
| 01:53PM | 24 |
| 01:53PM | 25 |

MR. GALANTE:  I think the Court/Judge earlier indicated that he characterizes this solicitation in his opinion.

MR. REYNAUD:  Yes.

THE COURT:  Well, it was solicitation --

MR. GALANTE:  Yes, Your Honor.

THE COURT:  -- flat out.

MR. GALANTE:  That's right, Your Honor.  I understand.

THE COURT:  Let's not mince words about it.

MR. REYNAUD:  I agree.

THE COURT:  It was illegal.

MR. GALANTE:  Did you have any awareness of what was going on?

MR. REYNAUD:  No, I did not.

MR. GALANTE:  Did you have any awareness of even what companies were doing what and where?

MR. REYNAUD:  Well, I knew -- I know what Velawcity -- I knew Velawcity was our marketing firm but that's it.  I was told they were a large marketing firm that did billboards and bus wraps and bus stops and that sort of thing, and for that matter leaflets that they would send to each of the homes in New Orleans.  I got five of them myself.  So I knew they were putting the money in and it was very ubiquitous, as I termed it, I

01:53PM    1      think, in the brief.

01:53PM    2          MR. GALANTE:  I was going to say, did you see

01:53PM    3      evidence of this marketing?

01:53PM    4          MR. REYNAUD:  Absolutely.  It was the market was

01:53PM    5      pervasive, it was everywhere, flooded with this

01:53PM    6      marketing.

01:53PM    7          MR. GALANTE:  So, again, while this was going on,

01:53PM    8      what did you understand about the amounts of case

01:53PM    9      volumes that were coming in?

01:53PM   10          MR. REYNAUD:  I didn't know what case volumes were

01:53PM   11      coming in, honestly.  That was actually the point, is

01:53PM   12      that I was sitting there handling the cases that were in

01:53PM   13      litigation, that were assigned to me because they were

01:53PM   14      in litigation and had an issue that was pressing that

01:53PM   15      needed to be addressed.  I had rumors and I heard rumors

01:53PM   16      often about how many cases but it varied.  It varied

01:53PM   17      tremendously.  So one minute somebody says we have a

01:53PM   18      thousand cases, next minute somebody says 10,000 cases,

01:53PM   19      then somebody says that's ridiculous.  I still don't

01:54PM   20      know to this day how many cases they ever had.

01:54PM   21          MR. GALANTE:  I know you got to this earlier but

01:54PM   22      now I want to ask you:  When you were working at the MMA

01:54PM   23      office as we're going into August of 2022, tell the

01:54PM   24      Court what you want to tell the Court about your ability

01:54PM   25      to be contacted by a client.

01:54PM 1        MR. REYNAUD:  Well, I don't know.  It's just the
01:54PM 2    one point that I made, I think, in my brief is that I
01:54PM 3    was the only attorney at MMA that had my cell phone on
01:54PM 4    the website.  And I was teased about that by others at
01:54PM 5    MMA because they said that would be a bad idea since
01:54PM 6    clients would call me all the time, nights and weekends,
01:54PM 7    and they did, most of whom I'd never spoken to.  Now, I
01:54PM 8    did talk to the clients I was dealing with on a
01:54PM 9    day-to-day basis in litigation all the time.  I even
01:54PM 10   have their numbers in my phone.  But I would get random
01:54PM 11   people calling me that would say, "I'm a client of MMA.
01:54PM 12   I need to know the status of my case."  I would make a
01:54PM 13   note and, if I was at work, look it up and try to answer
01:54PM 14   their questions.  Always, there was a policy, there was
01:55PM 15   a claim, and we're trying to figure out something.
01:55PM 16   Maybe it was set for mediation or something like that.
01:55PM 17   And I would try to answer their questions as best I
01:55PM 18   could.  If I couldn't answer their questions, I would
01:55PM 19   forward their information and the message to William or
01:55PM 20   to somebody else at our office to address the question.
01:55PM 21   And I did that a lot.  That was -- I did that so much so
01:55PM 22   that it was becoming very, very -- it was tough.
01:55PM 23       THE COURT:  So, basically, you sent it into the
01:55PM 24   abyss because most people got no answers, from what I
01:55PM 25   hear --

01:55PM   1        MR. REYNAUD:  Well --

01:55PM   2        THE COURT:  -- because they would call your office

01:55PM   3    and it would be a call center.

01:55PM   4        MR. REYNAUD:  Right.

01:55PM   5        THE COURT:  What law firm uses a call center, for

01:55PM   6    God's sake?

01:55PM   7        MR. REYNAUD:  MMA did, apparently.

01:55PM   8        THE COURT:  You got to -- that's the number one Bar

01:55PM   9    complaint for lawyers, is lack of communication with

01:55PM  10    their clients.

01:55PM  11        MR. REYNAUD:  Right.

01:55PM  12        THE COURT:  You've got to talk to your clients.

01:55PM  13    I've said it before, I'll say it again.  This is a

01:55PM  14    people business.  We can all make money, but it's a

01:55PM  15    people business first.  Go ahead.

01:55PM  16        MR. GALANTE:  No, I appreciate Your Honor.

01:55PM  17        What about when clients came into the New Orleans

01:56PM  18    office?

01:56PM  19        MR. REYNAUD:  Well, when clients came into the New

01:56PM  20    Orleans office they would usually walk in with the same

01:56PM  21    type of -- unannounced and ask for an update on their

01:56PM  22    case or would hand you documents, pictures, and that

01:56PM  23    sort to help buttress their claim.  I worked upstairs so

01:56PM  24    I was never -- for the most part I worked upstairs.  I

01:56PM  25    worked downstairs for the first part and then I worked

| | |
|---|---|
| 01:56PM | 1 |
| 01:56PM | 2 |
| 01:56PM | 3 |
| 01:56PM | 4 |
| 01:56PM | 5 |
| 01:56PM | 6 |
| 01:56PM | 7 |
| 01:56PM | 8 |
| 01:56PM | 9 |
| 01:56PM | 10 |
| 01:56PM | 11 |
| 01:56PM | 12 |
| 01:56PM | 13 |
| 01:56PM | 14 |
| 01:56PM | 15 |
| 01:56PM | 16 |
| 01:57PM | 17 |
| 01:57PM | 18 |
| 01:57PM | 19 |
| 01:57PM | 20 |
| 01:57PM | 21 |
| 01:57PM | 22 |
| 01:57PM | 23 |
| 01:57PM | 24 |
| 01:57PM | 25 |

1  upstairs after that.

2      THE COURT:  Let me ask, you said your job was to

3  litigate the claims --

4      MR. REYNAUD:  Yes, sir.

5      THE COURT:  -- litigate the claims, right?

6      MR. REYNAUD:  Yes, sir.

7      THE COURT:  But you had no involvement in the

8  claims prior to suit being filed?

9      MR. REYNAUD:  That's correct, Your Honor.

10     THE COURT:  So from a person who used to do a lot

11  of litigation, it seems to me one of the primary things

12  I would do is try to work that claim up before suit's

13  filed in preparation if it had to be litigated; but you

14  didn't have any involvement in that.  So you would just

15  take the scraps of whatever they gave you and then have

16  to litigate it?

17     MR. REYNAUD:  I hate to answer it with a one word

18  question, but yes.  That's pretty much -- it seemed

19  that's -- the scraps in many cases was what I was

20  dealing with.  In many cases there were not just scraps.

21  But I was dealing with what I was presented as a package

22  of this needs to be litigated, now this is the suit

23  that's been filed.

24     THE COURT:  So let me ask you, at your time there,

25  how many times did you sit down in a room with a client

| | |
|---|---|
| 01:57PM | 1 |
| 01:57PM | 2 |
| 01:57PM | 3 |
| 01:57PM | 4 |
| 01:57PM | 5 |
| 01:57PM | 6 |
| 01:57PM | 7 |
| 01:57PM | 8 |
| 01:57PM | 9 |

1   and prepare them to be deposed for their case?

2        MR. REYNAUD:  Several.

3        THE COURT:  So you had some depositions?

4        MR. REYNAUD:  Yes, sir.

5        THE COURT:  And beyond that, did you ever try one

6   of these cases?

7        MR. REYNAUD:  I never got to the trial period, no,

8   sir.

9        THE COURT:  Go ahead.

10       MR. GALANTE:  And I'd like to highlight what the

11   Court's asking you because, I mean, to this point we're

12   in the middle of August 2022.  And I understand the

13   Court's inquiry when it comes to you're just handed

14   these cases upon filing.  But from a general sense, what

15   was the condition of the cases up to the middle of

16   August 2022 when you got them?

17       MR. REYNAUD:  Say that one more time.

18       MR. GALANTE:  What kind of condition were the cases

19   in?  How far progressed were they?  What work had been

20   done?

21       MR. REYNAUD:  The ones before we filed in this

22   district?

23       MR. GALANTE:  Yes.

24       MR. REYNAUD:  Well, knowing what I know now, it

25   seems like there had been estimates prepared, there had

| | |
|---|---|
| 01:58PM | 1 |

been letters of representation sent out, there had been

estimates prepared, there had been demands sent out for

mediations in most cases, I'm presuming because that's

normally how William operated, and then there was

correspondence between clients and the firm to the

extent I was aware.  That's pretty much it.

     MR. GALANTE:  Did they appear to be reasonably

prepared to be filed?

     MR. REYNAUD:  In my opinion, yes.

     MR. GALANTE:  Let's talk with the Court about your

understanding of what William Huye was going to be

filing in this district in August of 2022.

     MR. REYNAUD:  Okay.

     MR. GALANTE:  Tell the Court a little bit about

what you understood the nature of the filings that were

to take place in the Western District regarding the

cases.

     MR. REYNAUD:  Well, his legal strategy, which I

objected to, was to file a series of lawsuits using the

permissive joinder statute based on a commonality of

facts and other issues.  He spoke to me about this

before and I said I didn't think it would work, and he

overruled me multiple times.

     THE COURT:  You have a lot more experience than

him.

| | | |
|---|---|---|
| 01:59PM | 1 | MR. REYNAUD:  Yes. |
| 01:59PM | 2 | THE COURT:  I mean, he had been out of law school |
| 01:59PM | 3 | four years.  You'd been practicing 13, 15 years.  And |
| 01:59PM | 4 | you should have said, "Mr. Huye, there's no way that you |
| 01:59PM | 5 | can file permissive joinder in federal court on a |
| 01:59PM | 6 | hurricane lawsuit.  The claims are different.  The homes |
| 02:00PM | 7 | are different, different sizes, different insurance |
| 02:00PM | 8 | policies, different damages, different scopes.  There's |
| 02:00PM | 9 | so many variables.  There's no way you can do a |
| 02:00PM | 10 | permissive joinder in federal court on these claims." |
| 02:00PM | 11 | And you have the experience and a duty as an officer of |
| 02:00PM | 12 | this court.  You should have put your foot down.  I |
| 02:00PM | 13 | don't care.  You had a lot more experience than him. |
| 02:00PM | 14 | You know better than this. |
| 02:00PM | 15 | MR. REYNAUD:  Right.  He was my boss.  That's, I |
| 02:00PM | 16 | guess, my only answer.  I had no -- I tried to tell him |
| 02:00PM | 17 | that. |
| 02:00PM | 18 | THE COURT:  I'm sorry.  I'm not buying the |
| 02:00PM | 19 | Nuremberg defense, okay, "I'm just following orders." |
| 02:00PM | 20 | MR. REYNAUD:  I'm not saying I was following |
| 02:00PM | 21 | orders.  I just couldn't convince him otherwise and so I |
| 02:00PM | 22 | was -- had to go along with it, and that's what |
| 02:00PM | 23 | happened. |
| 02:00PM | 24 | MR. GALANTE:  Even at that time, though, did you |
| 02:00PM | 25 | understand the volume of cases that were going to be |

02:00PM    1    filed?

02:00PM    2         MR. REYNAUD:  I did not, no.

02:00PM    3         MR. GALANTE:  Did you have any idea that the

02:00PM    4    joinders would have amounted to the 1600 plus number?

02:01PM    5         MR. REYNAUD:  I was not aware there was 1600.  I

02:01PM    6    was told it was a lot but had no idea how many.  I was

02:01PM    7    of the opinion it was around a thousand or more.

02:01PM    8         MR. GALANTE:  And your understanding was at that

02:01PM    9    time that your name would not be on those pleadings and

02:01PM   10    you would not be involved in the filing?

02:01PM   11         MR. REYNAUD:  That is correct, yes.

02:01PM   12         MR. GALANTE:  And, as I understand it, the first

02:01PM   13    joinder pleading was filed on August the 18th, 2022; is

02:01PM   14    that right?

02:01PM   15         MR. REYNAUD:  I can't remember the exact date, but

02:01PM   16    yes.  It was around that time, yes.

02:01PM   17         MR. GALANTE:  Given that was the date, what

02:01PM   18    happened the next day, Friday, August 19?

02:01PM   19         MR. REYNAUD:  It was either the next day or shortly

02:01PM   20    thereafter, it was rejected by this Court for good

02:01PM   21    reason.

02:01PM   22         MR. GALANTE:  And then what communication did you

02:01PM   23    receive?

02:01PM   24         MR. REYNAUD:  Well, a couple days later -- I think

02:01PM   25    it was August 19th, actually, if I recall correctly.  He

23-30671.820

|         |    |                                                          |
|---------|----|----------------------------------------------------------|
| 02:01PM | 1  | texted us after hours and said we need your Pacer        |
| 02:01PM | 2  | accounts to file separate lawsuits in all of these cases |
| 02:01PM | 3  | that we were previously going to file using permissive   |
| 02:02PM | 4  | joinder and now we can't.  He was actually originally     |
| 02:02PM | 5  | going to do it himself until he realized that he         |
| 02:02PM | 6  | couldn't do it time-wise, time crunch, which is --       |
| 02:02PM | 7  | THE COURT:  And you were okay with him using your         |
| 02:02PM | 8  | Pacer account, which is your federal court filing        |
| 02:02PM | 9  | account, to do this?  You know the rules do not allow     |
| 02:02PM | 10 | you to allow someone else to use your Pacer account.     |
| 02:02PM | 11 | MR. REYNAUD:  I was okay with it at the time             |
| 02:02PM | 12 | insofar as I thought and he told me that all of the      |
| 02:02PM | 13 | cases were completely -- all of the data that would be   |
| 02:02PM | 14 | in these suits were completely verified and true.        |
| 02:02PM | 15 | THE COURT:  We found that out pretty quick that          |
| 02:02PM | 16 | that wasn't the case.                                    |
| 02:02PM | 17 | MR. REYNAUD:  That is correct.                           |
| 02:02PM | 18 | THE COURT:  We had duplicates.  We had cases that        |
| 02:02PM | 19 | had already settled that had been filed.  Correct?      |
| 02:02PM | 20 | MR. REYNAUD:  Right.  Yes, sir.                          |
| 02:02PM | 21 | THE COURT:  And no one verified these lawsuits or       |
| 02:02PM | 22 | talked to these people before they filed these suits.   |
| 02:02PM | 23 | I'm sorry.  I do not accept that.  There's no way y'all  |
| 02:02PM | 24 | talked to this many people prior to filing these suits  |
| 02:02PM | 25 | in this court.                                           |

|          |    |                                                    |
|----------|----|----------------------------------------------------|
| 02:02PM  | 1  | MR. REYNAUD:  I did not.  I was told that our firm  |
| 02:03PM  | 2  | had and that Mr. Huye had and others at our firm had. |
| 02:03PM  | 3  | He told me that multiple times and that we had received |
| 02:03PM  | 4  | corroborating documentation from the clients and/or the |
| 02:03PM  | 5  | insurance companies that would validate and verify |
| 02:03PM  | 6  | everything that was put in the petitions, which was a |
| 02:03PM  | 7  | complete lie. |
| 02:03PM  | 8  | THE COURT:  Well, after the initial suits were |
| 02:03PM  | 9  | filed and I had my first hearing here I sent |
| 02:03PM  | 10 | Mr. Gardiner, he was here, I don't know if he's still |
| 02:03PM  | 11 | here or not, and Mr. Huye back to New Orleans and said, |
| 02:03PM  | 12 | "Clean it up.  Get in there, look at these files, call |
| 02:03PM  | 13 | these clients, verify the data, what you've claimed. |
| 02:03PM  | 14 | Clean it up."  They didn't do it.  Did they come back |
| 02:03PM  | 15 | and get with you about this? |
| 02:03PM  | 16 | MR. REYNAUD:  Yes, they did and they -- |
| 02:03PM  | 17 | THE COURT:  Seems like y'all went right back to |
| 02:03PM  | 18 | trying to mediate and settle them. |
| 02:03PM  | 19 | MR. REYNAUD:  Actually, they did do that a little |
| 02:03PM  | 20 | bit, too.  I wasn't privy to that process.  I was never |
| 02:04PM  | 21 | in the mediation role.  However, he did come back and |
| 02:04PM  | 22 | say we need to start dismissing the duplicate lawsuits |
| 02:04PM  | 23 | and finding the suits that were filed incorrectly and |
| 02:04PM  | 24 | dismissing those.  So there was an ongoing pretty |
| 02:04PM  | 25 | extensive process of locating the cases that were |

23-30671.822

02:04PM  1    incorrectly filed in this court and dismissing them, and

02:04PM  2    that was -- for a couple months we did that.

02:04PM  3        MR. GALANTE:  I was going to actually ask you,

02:04PM  4    Claude, that's what actually resulted in you being

02:04PM  5    before this Court --

02:04PM  6        MR. REYNAUD:  That is correct.

02:04PM  7        MR. GALANTE:  -- in December --

02:04PM  8        MR. REYNAUD:  Yes.

02:04PM  9        MR. GALANTE:  -- was trying to clean up some of

02:04PM  10   these duplicate filings?

02:04PM  11       MR. REYNAUD:  That is correct.

02:04PM  12       MR. GALANTE:  Tell the Court a little bit about

02:04PM  13   your appearance that day.

02:04PM  14       MR. REYNAUD:  Well, when I was here with William my

02:04PM  15   role, per his, you know, directive, was that I was going

02:04PM  16   to be here to handle what he called the procedural

02:04PM  17   issues relating to the joint dismissal -- excuse me, the

02:04PM  18   consent dismissal which Your Honor had requested be a

02:04PM  19   joint dismissal with the other side for obvious reasons.

02:05PM  20   And so I was here to talk about that based on the

02:05PM  21   instructions from the Court and from -- and I guess the

02:05PM  22   way that we had tried to comply -- MMA tried to comply

02:05PM  23   with those orders.

02:05PM  24       MR. GALANTE:  So I want to go back to August at the

02:05PM  25   time of the filing.  I presume you agree with your

|          |    |                                                          |
|----------|----|----------------------------------------------------------|
| 02:05PM  | 1  | former colleagues that you were told there was           |
| 02:05PM  | 2  | mathematically not the ability for a single filer to     |
| 02:05PM  | 3  | file everything.                                         |
| 02:05PM  | 4  | MR. REYNAUD:  Yeah.                                       |
| 02:05PM  | 5  | MR. GALANTE:  Do you agree with that?                    |
| 02:05PM  | 6  | MR. REYNAUD:  Yes.                                        |
| 02:05PM  | 7  | MR. GALANTE:  To the extent that you understood the      |
| 02:05PM  | 8  | timing between when Mr. Huye got to you and asked for    |
| 02:05PM  | 9  | your credentials to when the prescription date was, do   |
| 02:05PM  | 10 | you believe that they needed those credentials to meet   |
| 02:05PM  | 11 | the client obligations?                                  |
| 02:05PM  | 12 | MR. REYNAUD:  Yes, they needed the credentials in        |
| 02:05PM  | 13 | order to get all the files -- all the lawsuits filed.    |
| 02:05PM  | 14 | My thinking at the time was that if I did not allow that |
| 02:06PM  | 15 | to happen, and William said this, he said, "They're      |
| 02:06PM  | 16 | going to prescribe if you do not let us use your Pacer   |
| 02:06PM  | 17 | account."  I thought to myself there's no question,      |
| 02:06PM  | 18 | there's no decision here to be made.  I had to let it    |
| 02:06PM  | 19 | happen.                                                  |
| 02:06PM  | 20 | MR. GALANTE:  I would like to ask, you know, at          |
| 02:06PM  | 21 | that point, when you were asked for those credentials,   |
| 02:06PM  | 22 | had you at that point had any evidence that the firm's   |
| 02:06PM  | 23 | infrastructure or staff had previously gotten anything   |
| 02:06PM  | 24 | wrong in the filings that you were handling?             |
| 02:06PM  | 25 | MR. REYNAUD:  No.                                         |

02:06PM   1          MR. GALANTE:  At that point you had been with the
02:06PM   2      firm for nearly a year?
02:06PM   3          MR. REYNAUD:  Yes.
02:06PM   4          MR. GALANTE:  At that point you'd litigated in
02:06PM   5      several jurisdictions?
02:06PM   6          MR. REYNAUD:  Yes.
02:06PM   7          MR. GALANTE:  At that point you'd been litigating
02:06PM   8      cases in which you were relying on those subordinate
02:06PM   9      preparations?
02:06PM  10          MR. REYNAUD:  Yes.  Yes.
02:06PM  11          MR. GALANTE:  At that point did you understand that
02:06PM  12      there had been any other problems with those
02:06PM  13      litigations?
02:06PM  14          MR. REYNAUD:  No, there was no problems in any
02:06PM  15      cases I ever litigated prior to the August -- excuse me,
02:06PM  16      the cases filed in this court.  I was not aware of any
02:06PM  17      issues.  All of the cases that I litigated had policies
02:06PM  18      and were the right defendant and were just like any
02:06PM  19      normal case that I worked on in my career.
02:07PM  20          MR. GALANTE:  Even upon inquiry from defense
02:07PM  21      counsel, when you went to a file isn't it true you found
02:07PM  22      in the file what --
02:07PM  23          MR. REYNAUD:  That is correct.  Yes, I did.
02:07PM  24          MR. GALANTE:  In the cases where you mediated
02:07PM  25      several cases, the clients were there?

|         |    |                                                          |
|---------|----|----------------------------------------------------------|
| 02:07PM | 1  | MR. REYNAUD:  That's right.  So in the few Laura          |
| 02:07PM | 2  | and Delta cases that I did handle and resolve all the     |
| 02:07PM | 3  | way to mediation, actually mediated one in Lafayette,     |
| 02:07PM | 4  | one in Lake Charles, had the defendant -- excuse me, the  |
| 02:07PM | 5  | client there and we resolved both of them.               |
| 02:07PM | 6  | MR. GALANTE:  Did you believe the choice you were         |
| 02:07PM | 7  | making was whether to have the firm support staff use     |
| 02:07PM | 8  | your Pacer log and account information to file suits or   |
| 02:07PM | 9  | knowingly allow cases -- clients of the firm have their   |
| 02:07PM | 10 | cases prescribe?                                          |
| 02:07PM | 11 | MR. REYNAUD:  Yeah, that's exactly what it was.           |
| 02:07PM | 12 | And I didn't -- but at the time that's a little -- I      |
| 02:07PM | 13 | can't really say that's exactly what I was thinking at    |
| 02:07PM | 14 | the time --                                               |
| 02:07PM | 15 | MR. GALANTE:  Understood.                                 |
| 02:07PM | 16 | MR. REYNAUD:  -- because at the time I didn't             |
| 02:08PM | 17 | suspect anything to be wrong with it.  So the only        |
| 02:08PM | 18 | Sophie's choice, so to speak, is with the benefit of      |
| 02:08PM | 19 | hindsight now.  If I had known there may be some          |
| 02:08PM | 20 | problems, then yeah, still that would have been my        |
| 02:08PM | 21 | choice at the time; but at the time I really didn't know  |
| 02:08PM | 22 | or suspect or have any reason to suspect that there was   |
| 02:08PM | 23 | any issues or problems with any of the lawsuits to be     |
| 02:08PM | 24 | filed.  I just knew they needed to be filed within a      |
| 02:08PM | 25 | week.                                                     |

23-30671.826

02:08PM    1          MR. GALANTE:  And you described your understanding
02:08PM    2   of the October hearing you didn't attend but William
02:08PM    3   came home and discussed it.  You heard Grant Gardiner's
02:08PM    4   testimony.  Do you agree that was sort of the atmosphere
02:08PM    5   after the hearing?
02:08PM    6          MR. REYNAUD:  I honestly do not recall much from
02:08PM    7   how they reported back on that hearing.  I just remember
02:08PM    8   reading the transcript shortly before I came to the
02:08PM    9   December 13th hearing.
02:08PM   10          MR. GALANTE:  I'll ask you directly.  You heard
02:08PM   11   them testify saying William just explained it away, that
02:08PM   12   kind of problem --
02:08PM   13          MR. REYNAUD:  That's typically what he did.
02:08PM   14          MR. GALANTE:  -- is not a problem?
02:08PM   15          MR. REYNAUD:  Yes.
02:08PM   16          MR. GALANTE:  Is that the same explanation you
02:08PM   17   received?
02:08PM   18          MR. REYNAUD:  It's always the explanation everyone
02:09PM   19   received from William.  It was almost gaslighting.
02:09PM   20          THE COURT:  You were here for that hearing in
02:09PM   21   December --
02:09PM   22          MR. REYNAUD:  I was, yes, sir.
02:09PM   23          THE COURT:  -- and I pointed out to all of you that
02:09PM   24   a check was forged.  A stamp was used for a power of
02:09PM   25   attorney.  A forged signature was placed on that check

23-30671.827

| | |
|---|---|
| 02:09PM | 1 |

for a mortgage company or mortgage holder.  And, you
know, don't you think some red flags ought to be going
up when I'm pointing out to Mr. Huye and you that y'all
are forging checks?

    MR. REYNAUD:  Absolutely.

    MR. GALANTE:  Would you like to explain to the
Court what you were told and your understanding was?

    MR. REYNAUD:  Yeah.  So my understanding that day
and shortly after that day is this is what happened.
Somebody in the Houston office, whether it was a COO or
Zach or whoever was endorsing the checks, thought that
the mortgage company, which in that case was an
individual, was the client and so they mistakenly wrote
his name in there thinking it was the client because
they thought they had power of attorney, which
apparently they did not, which was a whole other issue.
So to say that there are -- red flags arose that day,
absolutely.  There were many, many red flags.  And
that's one of the first times that I was starting to
question everything that was going on.

    THE COURT:  Well, I specifically asked Mr. Huye
about the mortgage holders and why he had a stamp
because when you have a stamp that says POA what that
tells me is you're doing it a lot because you're
stamping it.

23-30671.828

02:10PM   1        MR. REYNAUD:  Right.

02:10PM   2        THE COURT:  And he said, "Oh, we're working out an

02:10PM   3   agreement with mortgage holders to endorse checks."  I

02:10PM   4   remember him saying that.  I remember specifically

02:10PM   5   saying to him, "If you get a mortgage company to agree

02:10PM   6   to that, let me know.  I'm moving my mortgage."  Because

02:10PM   7   that's never going to happen.  They don't do that.  They

02:10PM   8   never give their power of attorney to anyone to sign

02:10PM   9   those checks.  You have to send it to them and wait for

02:10PM   10  it to come back.

02:10PM   11       So I'm trying to understand your mindset.  You want

02:11PM   12  me to lift the suspension on you, and I'm telling you I

02:11PM   13  pointed out to you they were forging checks.  To me as a

02:11PM   14  lawyer and your ethics required you to question that a

02:11PM   15  great deal and probably distance yourself from it.

02:11PM   16       MR. REYNAUD:  I began questioning that immediately.

02:11PM   17  On the ride home, in fact, I asked William.  Almost the

02:11PM   18  whole way we talked about it.  He assured me that it was

02:11PM   19  just a mistake, there was no fraudulent intent, the

02:11PM   20  money had not gone anywhere, they would rectify it

02:11PM   21  immediately, and there was nothing to worry about.

02:11PM   22       THE COURT:  You also understand as a Louisiana

02:11PM   23  attorney licensed in this state you're not allowed to

02:11PM   24  have a trust account outside the state of Louisiana for

02:11PM   25  Louisiana residents; you knew that?

02:11PM 1       MR. REYNAUD:  My understanding, Judge, is that the

02:11PM 2  rule -- I thought we were compliant with the trust

02:11PM 3  account.

02:11PM 4       THE COURT:  Let me just tell you, you're not

02:11PM 5  compliant.

02:11PM 6       MR. REYNAUD:  I was told we were compliant because

02:11PM 7  I thought there was a Chase --

02:11PM 8       THE COURT:  The rules in this state require a trust

02:11PM 9  account for Louisiana residents to be held in a bank in

02:12PM 10  the state.  Can be Chase, but it has to be an account in

02:12PM 11  Louisiana and has to be registered with the Office of

02:12PM 12  Disciplinary Counsel and the State Bar with overdraft

02:12PM 13  notification to the Bar.

02:12PM 14       MR. REYNAUD:  I have never --

02:12PM 15       THE COURT:  You've been practicing for 13 years.

02:12PM 16  You have to know that is the rule in Louisiana for a

02:12PM 17  trust account.  You cannot have it out of state.  We

02:12PM 18  will talk to Mr. Moseley after a while about that.  You

02:12PM 19  knew that they were depositing this money outside the

02:12PM 20  state of Louisiana.

02:12PM 21       MR. REYNAUD:  I did not know where they were

02:12PM 22  depositing the money, Your Honor.  I knew the Houston

02:12PM 23  office was handling the checks.  That's all I knew.

02:12PM 24       THE COURT:  So after you get a settlement you don't

02:12PM 25  know what happens to the money?  Do you know what the

23-30671.830

procedures were to verify the clients got their proceeds from their settlement?

MR. REYNAUD:  Well, I'll give an example of one of the cases I mediated in Louisiana.  After I finished the mediation in which we settled I sent an e-mail or confirmed the settlement via e-mail between counsel.  I sent an e-mail to our accounting department.  We actually had somebody who was doing the release agreements at the time.  And I said we've settled this case for this amount, they've agreed to pay this amount, and please execute.  And then so I had the client's personal information on my phone and we stayed in contact until he got the money.  That's what I did.

MR. GALANTE:  Claude, is that true for every case you were involved in the settlement of at MMA?

MR. REYNAUD:  Yeah, that is true.

MR. GALANTE:  Was there any time whatsoever, to address the Court's concern, that you were involved in the settlement of an MMA client's claim that you didn't follow up to ensure they got the money?

MR. REYNAUD:  Not directly.  I was never directly involved in the settlement of a client's claim that I did not follow up with the client, no.

MR. GALANTE:  Are you hedging about those mediations that you attended?

02:13PM     1          MR. REYNAUD:  Yes.  Yes.

02:13PM     2          MR. GALANTE:  Again, just so we're clear, in those

02:13PM     3     mediations were you the attorney actually doing the

02:13PM     4     settling?

02:13PM     5          MR. REYNAUD:  I was there participating insofar as

02:14PM     6     I was helping William, but William was the authority on

02:14PM     7     whether we could settle for what it was.  I had never

02:14PM     8     spoken to the clients previous to the mediations.  I was

02:14PM     9     there learning how the process was working.

02:14PM    10          MR. GALANTE:  So we've accelerated.  We're in

02:14PM    11     December of 2022 and we've now made an understanding of

02:14PM    12     what your conversation with Mr. Huye was.  Was that a

02:14PM    13     common pattern, if any problems came up that Mr. Huye

02:14PM    14     would give you an explanation?

02:14PM    15          MR. REYNAUD:  No.

02:14PM    16          MR. GALANTE:  And was there any time when you ran

02:14PM    17     into case problems where he couldn't explain something

02:14PM    18     to you?

02:14PM    19          MR. REYNAUD:  He would always have an explanation.

02:14PM    20          MR. GALANTE:  I didn't think you understood my

02:14PM    21     question.

02:14PM    22          MR. REYNAUD:  He would always have an explanation

02:14PM    23     for everything.  Today I'm embarrassed and ashamed and I

02:14PM    24     can't think of a better word than embarrassed that I

02:14PM    25     believed what he said all the time.  He was very good at

| 02:14PM | 1  | convincing people that everything -- |
|---------|----|--------------------------------------|
| 02:14PM | 2  | THE COURT:  I didn't know him very well at all and |
| 02:15PM | 3  | I could tell in October.  When he came in my courtroom |
| 02:15PM | 4  | and started talking I didn't believe him.  So I'm trying |
| 02:15PM | 5  | to question how you didn't not believe him as an |
| 02:15PM | 6  | experienced attorney.  I knew that first day.  I called |
| 02:15PM | 7  | it out.  I said, "What y'all are doing is unethical and |
| 02:15PM | 8  | probably illegal."  And I guess I have a hard time |
| 02:15PM | 9  | understanding how you-all are there involved and y'all |
| 02:15PM | 10 | don't see it and I saw it.  The first day they walked in |
| 02:15PM | 11 | my courtroom I could see it.  Now, I had dealt with |
| 02:15PM | 12 | about 6,000 hurricane lawsuits at that point.  I had a |
| 02:15PM | 13 | pretty good idea how you do them.  But I guess I'm |
| 02:15PM | 14 | grasping with trying to understand how y'all all are |
| 02:15PM | 15 | saying we didn't know, we just believed him.  I'm really |
| 02:15PM | 16 | having a hard time with this explanation, and from you |
| 02:15PM | 17 | in particular because you're a little more experienced |
| 02:15PM | 18 | than Mr. Gardiner or Mr. Snowden.  You've been |
| 02:15PM | 19 | practicing a while. |
| 02:15PM | 20 | MR. REYNAUD:  Your Honor, I guess my only -- I'm |
| 02:15PM | 21 | not trying to justify anything.  I really am not.  I |
| 02:16PM | 22 | guess one of the explanations I can provide is that I've |
| 02:16PM | 23 | never handled a mass amount of settlements.  I have |
| 02:16PM | 24 | always been large scale litigation doing nothing with |
| 02:16PM | 25 | money.  In this particular firm I didn't do anything |

02:16PM 1    with money either.  I didn't involve myself with the

02:16PM 2    settlements.  I was litigating the issues and the

02:16PM 3    procedural and substantive legal issues, drafting and

02:16PM 4    drafting and drafting and doing the discovery process

02:16PM 5    and preparing for pretrial hearings and that sort of

02:16PM 6    thing.  So I know ignorance is not an excuse, but in

02:16PM 7    this case I really did believe William that the issues

02:16PM 8    that he claimed were fixed were fixed or that did not

02:16PM 9    exist did not exist.  I really honestly and truly

02:16PM 10   believed him and did not think that anything was as bad

02:16PM 11   as it really was, and now I regret thinking that and am

02:17PM 12   ashamed.  And I apologize for everything that's

02:17PM 13   happened.  I can't say that with enough enunciation.

02:17PM 14       MR. GALANTE:  Had you ever worked on plaintiffs

02:17PM 15   cases before you got to MMA?

02:17PM 16       MR. REYNAUD:  No.  Well, that's not true.  I

02:17PM 17   litigated some back in the day.  When I had commercial

02:17PM 18   clients we sued on noncompete agreements and that sort

02:17PM 19   of thing.

02:17PM 20       MR. GALANTE:  Then how about homeowner's insurance

02:17PM 21   claims?

02:17PM 22       MR. REYNAUD:  No.

02:17PM 23       MR. GALANTE:  This was a whole new experience for

02:17PM 24   you?

02:17PM 25       MR. REYNAUD:  Yes.  Yes.

23-30671.834

02:17PM  1          MR. GALANTE:  And --

02:17PM  2          THE COURT:  Go ahead.

02:17PM  3          MR. GALANTE:  And is it fair to say that you

02:17PM  4     understood Mr. Huye was coming from that background of

02:17PM  5     the Pandit firm?

02:17PM  6          MR. REYNAUD:  Yes, I did.  And I worked against

02:17PM  7     William in the defense of insurance claims so I have

02:17PM  8     that background.

02:17PM  9          MR. GALANTE:  While I understand the Court's

02:17PM  10    concern about how long you'd been practicing, was this a

02:17PM  11    brand-new practice to you when you got to MMA?

02:18PM  12         MR. REYNAUD:  Yes, it was a brand-new practice.  I

02:18PM  13    mean, I was excited because I thought this would be

02:18PM  14    something -- I was really enjoying the idea of

02:18PM  15    representing individuals against insurance companies and

02:18PM  16    I was enjoying it for the fist time, the practice of

02:18PM  17    law.  And I thought I was helping make a difference and

02:18PM  18    I was wrong.  I was hurting more than I was helping, and

02:18PM  19    that's the regret I have right now.

02:18PM  20         MR. GALANTE:  And so that I'm -- not to micromanage

02:18PM  21    this portion, but let's say after the first of the year

02:18PM  22    this year, why don't you tell the Court about your

02:18PM  23    development of understanding of the problems at MMA

02:18PM  24    starting with the next hearing in February.

02:18PM  25         MR. REYNAUD:  Well, February 1st was a hearing

02:18PM  1    before, I think, Judge North in the Eastern District.

02:18PM  2    Judge North reprimanded and came down on William and

02:18PM  3    Zach very, very harshly.  William showed back up at the

02:19PM  4    office and essentially told us that everything had gone

02:19PM  5    very well and that the hearing had gone better than

02:19PM  6    expected, that everything was in good order, and I

02:19PM  7    believed him.  I was so busy working on all of the

02:19PM  8    litigation stuff.  By that time I was working mostly on

02:19PM  9    information -- or, excuse me, lawsuits that were filed

02:19PM  10   for Ida but in the state courts that had not been

02:19PM  11   stayed.  So I was working on many, many motions and

02:19PM  12   exceptions per day so I didn't really have time to look

02:19PM  13   at the hearing transcript until much later.

02:19PM  14           February 17th, I think it was, December --

02:19PM  15   February 17th the cease and desist order came out and I

02:19PM  16   read that that day, and that's when I decided it's time

02:19PM  17   to leave.  This has been enough.  Everything that Judge

02:19PM  18   Cain and other counsel have been saying and William has

02:20PM  19   been refuting is absolutely -- has legs to it and this

02:20PM  20   is it.  So I told many people that day that was it.

02:20PM  21   That was when Grant and I started contemplating the idea

02:20PM  22   of leaving.

02:20PM  23           THE COURT:  So you were not involved at all, you're

02:20PM  24   telling me, in the mediation of any of these cases

02:20PM  25   except for the few you brought with you.

23-30671.836

02:20PM  1    MR. REYNAUD:  No, no, I was -- I mediated cases at

02:20PM  2    MAPS but not without William Huye being there.

02:20PM  3        THE COURT:  So he was always there when you did?

02:20PM  4        MR. REYNAUD:  Yes, sir.

02:20PM  5        THE COURT:  So how many would you do typically in a

02:20PM  6    day?  You've heard me ask this question of multiple

02:20PM  7    people.

02:20PM  8        MR. REYNAUD:  I think the most that I did or we

02:20PM  9    did, I was there present for, was seven to eight.  I

02:20PM  10   can't remember the exact number.  Maybe ten at the most,

02:20PM  11   but I think seven or eight.

02:20PM  12       THE COURT:  I question all this because on the

02:20PM  13   December hearing, and I'm not going to quote it verbatim

02:21PM  14   but I have a pretty good memory, I remember saying I

02:21PM  15   would only release these cases maybe four or five at a

02:21PM  16   time from my stay order because you were going to do

02:21PM  17   them individually.  You were going to represent these

02:21PM  18   people, be lawyers to them and mediate their cases

02:21PM  19   individually.  Do you remember me telling you that?

02:21PM  20       MR. REYNAUD:  I do.

02:21PM  21       THE COURT:  Then I remember saying the most I would

02:21PM  22   do is four or five at a time as they were prepped and

02:21PM  23   ready to go.

02:21PM  24       MR. REYNAUD:  Correct.

02:21PM  25       THE COURT:  I remember distinctly you said, "Judge,

23-30671.837

|          |    |                                                                        |
|----------|----|------------------------------------------------------------------------|
| 02:21PM  | 1  | why not you release a hundred?"  Do you remember asking                 |
| 02:21PM  | 2  | me to release a hundred at a time?                                      |
| 02:21PM  | 3  |     MR. REYNAUD:  I do not remember that.           |
| 02:21PM  | 4  |     THE COURT:  And I said no.  The reason I bring this |
| 02:21PM  | 5  | up is I made it clear you cannot mass settle these                     |
| 02:21PM  | 6  | hurricane cases.  These people's homes, these are very                 |
| 02:21PM  | 7  | individualized claims.  They deserve your attention as                 |
| 02:21PM  | 8  | lawyers.  So I guess I'm questioning why you were asking               |
| 02:21PM  | 9  | me to release a hundred cases at a time to you at that                 |
| 02:21PM  | 10 | hearing.                                                               |
| 02:21PM  | 11 |     MR. REYNAUD:  I think -- and I don't recall the |
| 02:21PM  | 12 | exact reason I asked that at the time but I have a                     |
| 02:22PM  | 13 | pretty good idea as to why.  I think the issue is that                 |
| 02:22PM  | 14 | we were trying to set as many for mediation as possible                |
| 02:22PM  | 15 | and I thought that -- that's not to say that we're mass                |
| 02:22PM  | 16 | settling.  That's to say the mediation team at MMA would               |
| 02:22PM  | 17 | be allowed to set or try to set more cases for                         |
| 02:22PM  | 18 | mediation, whether it be four or five a day or less or                 |
| 02:22PM  | 19 | more.  But it was never about the number of causes being               |
| 02:22PM  | 20 | settled or mediated at a time.  It was more so about                   |
| 02:22PM  | 21 | freeing the cases up so they could be even negotiated                  |
| 02:22PM  | 22 | towards mediation.  That was it.                                       |
| 02:22PM  | 23 |     THE COURT:  Okay.                              |
| 02:22PM  | 24 |     MR. GALANTE:  All right.  So at the time when you |
| 02:22PM  | 25 | finally decided and did tender your resignation, I'd                   |

| | |
|---|---|
| 02:22PM | 1 |
| 02:22PM | 2 |
| 02:22PM | 3 |
| 02:22PM | 4 |
| 02:23PM | 5 |
| 02:23PM | 6 |
| 02:23PM | 7 |
| 02:23PM | 8 |
| 02:23PM | 9 |
| 02:23PM | 10 |
| 02:23PM | 11 |
| 02:23PM | 12 |
| 02:23PM | 13 |
| 02:23PM | 14 |
| 02:23PM | 15 |
| 02:23PM | 16 |
| 02:23PM | 17 |
| 02:23PM | 18 |
| 02:23PM | 19 |
| 02:23PM | 20 |
| 02:24PM | 21 |
| 02:24PM | 22 |
| 02:24PM | 23 |
| 02:24PM | 24 |
| 02:24PM | 25 |

like you to tell the Court whether or not that was
solely predicated on --

MR. REYNAUD:  Oh, absolutely not.  So we had the
December -- excuse me.  The February 17th cease and
desist letter was the first catalyst that kind of made
me start deciding that I was leaving.  Then -- that was
right before Mardi Gras.  Right after Mardi Gras,
February 28th, I think is when I read -- if I recall
correctly, it was either a Monday or a Tuesday of the
week prior to the Saturday when we got suspended, I read
the transcript from the February 1st hearing.  That is
when it really hit me that everything that William had
been saying was just completely untrue, that everything
that he was saying was not just -- it was a lie.  It's
hard to say it any other way.  He misrepresented the
nature of the proceeding.  He would say things that
weren't even true or even factually based on anything
that happened at the hearing.  And the Apex thing was
there and that really hit me.

So at that point I said, "Okay.  Grant and Katie,
let's get out of here."  And we decided -- we started
planning our exit.  We started coming up with a law firm
name and our law firm practice and that sort of thing
and had the Articles of Incorporation or Organization,
rather, to be filed within a couple days and I think we

02:24PM   1    filed them that week, maybe that Friday.  And we were

02:24PM   2    planning on telling William and, I guess, Zach the next

02:24PM   3    week that we're done.  Then that Saturday is when this

02:24PM   4    Judge -- excuse me, this Court issued the order and

02:24PM   5    so we -- it prompted us to immediately resign because it

02:24PM   6    was just no longer a sustainable situation.

02:24PM   7         MR. GALANTE:  And shortly thereafter, I think we

02:24PM   8    heard Mr. Gardiner's testimony, he decided he wanted to

02:24PM   9    go in another direction?

02:24PM  10         MR. REYNAUD:  That's correct, yes.

02:24PM  11         MR. GALANTE:  Is it fair to say you looked for

02:24PM  12    employment at that time?

02:24PM  13         MR. REYNAUD:  I did.  I looked for employment for a

02:25PM  14    long time, until end of April of this year, and nobody

02:25PM  15    would -- nobody wanted to hire me given the suspension

02:25PM  16    order and the stuff that was looming over our heads.

02:25PM  17         MR. GALANTE:  And that actively affected your

02:25PM  18    ability in several job positions?

02:25PM  19         MR. REYNAUD:  Yes, it did.  So what I ended up

02:25PM  20    doing, Your Honor, is I have my own firm now.  We don't

02:25PM  21    have that many cases but we're working out of my house,

02:25PM  22    or I'm working out of my house.  But it's -- that's

02:25PM  23    generally what I was relegated to doing.  Not that I'm

02:25PM  24    disappointed.  I'm excited about doing it.  But

02:25PM  25    that's -- yeah, I was turned down for many jobs.

23-30671.840

02:25PM    1            MR. GALANTE:  And just to be clear, you mentioned
02:25PM    2    that there were a few cases of, quote, friends and
02:25PM    3    family that you'd brought to MMA that stayed with you,
02:25PM    4    right?
02:25PM    5            MR. REYNAUD:  That is correct, yes.
02:25PM    6            MR. GALANTE:  Outside of those people you have a
02:25PM    7    personal connection to, is it fair to say you are
02:25PM    8    looking for no interest nor any former clients of MMA?
02:25PM    9            MR. REYNAUD:  Absolutely, that's true.  No
02:26PM   10    interest, no fees, nothing.  I want to be completely
02:26PM   11    done with it.  The only case that I've brought was -- or
02:26PM   12    one of the two cases that I have, three I guess, was a
02:26PM   13    brother of an ex-girlfriend, my legal recruiter, I have
02:26PM   14    her case, that's about it.
02:26PM   15            MR. GALANTE:  So second to last question, have I
02:26PM   16    missed anything that you wanted to inform the Court?
02:26PM   17            MR. REYNAUD:  No.  I just want to -- I'm thankful
02:26PM   18    that I'm finally able to get in front of Your Honor to
02:26PM   19    tell my experience, and I hope that what I've said today
02:26PM   20    sheds some light on the differences between us as actors
02:26PM   21    and employees at MMA.  I would really love to answer any
02:26PM   22    more questions that you might have of me.  I am -- I'll
02:26PM   23    tell you anything that you want to know.  I'm here to
02:26PM   24    answer whatever you would like to know.  More than
02:27PM   25    anything, I'm apologetic.  But like I said, I'm just

02:27PM   1   embarrassed.  I'm ashamed and regretful of everything
02:27PM   2   that's happened.  I want to make the Court know that.  I
02:27PM   3   want to apologize to the citizenry of this district.
02:27PM   4         But again, the Pacer filings to me, knowing in
02:27PM   5   hindsight what I know now, I don't know what else I
02:27PM   6   would have done.
02:27PM   7         THE COURT:  The problem is with the way this went
02:27PM   8   down --
02:27PM   9         MR. REYNAUD:  Yeah, I know.
02:27PM  10         THE COURT:  -- you didn't help anybody.  You can
02:27PM  11   sit here and try to justify and any lawyer can justify
02:27PM  12   in their minds we were just trying to help people.  I
02:27PM  13   heard that from Mr. Huye multiple times.  You're not
02:27PM  14   helping anybody when you don't give them adequate, good
02:27PM  15   representation.  Just pushing their cases through some
02:27PM  16   system just to get it settled quickly is not doing the
02:27PM  17   client justice.  And you're not helping the Court,
02:28PM  18   you're not helping the client, you're not helping the
02:28PM  19   insurance companies probably trying to work to get the
02:28PM  20   claims settled.
02:28PM  21         99 percent of these insurers are trying.  Okay.
02:28PM  22   I'll give them kudos.  A lot of them have stepped up.
02:28PM  23   State Farm, I'm going to give State Farm a lot of kudos.
02:28PM  24   They have stepped up to the plate to try and resolve
02:28PM  25   these cases with people.  There's some others.  Allied

|          |    |                                                              |
|----------|----|--------------------------------------------------------------|
| 02:28PM  | 1  | and some others have stepped up to try to get it done.       |
| 02:28PM  | 2  | There was no need to do all this and mass settle             |
| 02:28PM  | 3  | and try to just cut corners.  You did a disservice to        |
| 02:28PM  | 4  | this community in which I live.  And, yeah, I do take it      |
| 02:28PM  | 5  | a little personal.  I'm from here.  This town went           |
| 02:28PM  | 6  | through a lot.  And my job is to protect this community      |
| 02:28PM  | 7  | and the citizens of this state and this country.  And so     |
| 02:28PM  | 8  | this is not the way to do it.                                 |
| 02:28PM  | 9  | MR. REYNAUD:  Right.                                          |
| 02:28PM  | 10 | THE COURT:  Y'all were not lawyers to these people.          |
| 02:28PM  | 11 | I'm sorry.  That's the way I see it.  And I was              |
| 02:29PM  | 12 | disappointed in it because up to that point we were two      |
| 02:29PM  | 13 | years into this after the post-storm and we were on a        |
| 02:29PM  | 14 | pretty good path and system of getting these cases           |
| 02:29PM  | 15 | resolved in a very efficient manner.  I think any lawyer     |
| 02:29PM  | 16 | who's participated in our Case Management Order on           |
| 02:29PM  | 17 | either side will tell you it's worked for the most part.     |
| 02:29PM  | 18 | It's got its bumps and there's always some issues, but I     |
| 02:29PM  | 19 | think it's worked pretty good.                                |
| 02:29PM  | 20 | There was no need to do what you did.  And by y'all          |
| 02:29PM  | 21 | dropping 1600 lawsuits on this Court, you tried to           |
| 02:29PM  | 22 | basically gum up the system.  And I wasn't going to let      |
| 02:29PM  | 23 | you do it.  That's why I stayed the cases.  They stay        |
| 02:29PM  | 24 | stayed to this day until I'm assured somebody's going to     |
| 02:29PM  | 25 | pick that file up and do the right thing.  Until that        |

02:29PM 1    happens, hell will freeze over before I lift the stay on

02:29PM 2    them; and it will only be on an individual case basis.

02:30PM 3         So I appreciate you coming here.  I do.  And I

02:30PM 4    appreciate you taking responsibility.  I do.  And I

02:30PM 5    appreciate that hopefully we've all learned something.

02:30PM 6    Maybe you'll be a little more awakened next time this

02:30PM 7    comes down the pike.  So I will consider shortening.

02:30PM 8    I'll take it under advisement.  I have a lot to think

02:30PM 9    about.  I'm going to have to review the transcript, but

02:30PM 10   I will consider it at some point.  It won't take me

02:30PM 11   long, but I'll take it under advisement on whether or

02:30PM 12   not to lift the suspension.

02:30PM 13        MR. GALANTE:  Thank you, Your Honor.  Few

02:30PM 14   housekeeping matters.

02:30PM 15        THE COURT:  Sure.

02:30PM 16        MR. GALANTE:  My final question was going to be do

02:30PM 17   you have any other questions from me.

02:30PM 18        THE COURT:  No.  I've probably said too much.

02:30PM 19        MR. GALANTE:  No.  I understand, Your Honor.  So

02:30PM 20   some housekeeping matters.  The first one would be I'd

02:30PM 21   like to adopt the legal portions of the briefs of the

02:30PM 22   colleagues that were filed in the record.  We weren't

02:31PM 23   certain whether this was evidentiary or otherwise and so

02:31PM 24   we're doing -- to the extent we have documents filed

02:31PM 25   into the record, like to adopt those pleadings.

| | | |
|---|---|---|
| 02:31PM | 1 | THE COURT:  They'll be adopted. |
| 02:31PM | 2 | MR. GALANTE:  Thank you.  And I guess the final |
| 02:31PM | 3 | detail would be we did add two affidavits that I think |
| 02:31PM | 4 | we've already -- we'd like to offer, file, and introduce |
| 02:31PM | 5 | them. |
| 02:31PM | 6 | THE COURT:  Sure.  They'll be admitted. |
| 02:31PM | 7 | MR. GALANTE:  And to the extent there were any |
| 02:31PM | 8 | desire by the Court to hear further legal briefing, we'd |
| 02:31PM | 9 | welcome the opportunity for post-hearing memorandum. |
| 02:31PM | 10 | THE COURT:  I don't think there's any need for any |
| 02:31PM | 11 | more briefing.  I mean, look, I'm not going to deny you |
| 02:31PM | 12 | the opportunity if you want to submit something.  I |
| 02:31PM | 13 | don't personally think I need anything. |
| 02:31PM | 14 | MR. GALANTE:  Something tells me you have enough |
| 02:31PM | 15 | work, Your Honor.  But if there was something you'd like |
| 02:31PM | 16 | to hear from us on, we would be welcome to further -- |
| 02:31PM | 17 | THE COURT:  I understand.  I appreciate it.  I |
| 02:31PM | 18 | don't mind work. |
| 02:31PM | 19 | MR. GALANTE:  I'm not saying anybody minds work. |
| 02:31PM | 20 | THE COURT:  Some people do but I don't. |
| 02:31PM | 21 | MR. REYNAUD:  Thank you, Your Honor. |
| 02:32PM | 22 | (Next matter.) |
| 02:32PM | 23 | THE COURT:  Mr. Moseley, you ready?  Come on up. |
| 02:32PM | 24 | You can stand at the table or podium, whichever you |
| 02:32PM | 25 | like, whatever's most comfortable for you.  Take your |

# CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of November, 2023, I electronically filed the foregoing with the Clerk of Court for the U.S. Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. All counsel of record are registered CM/ECF users, and will be served by the appellate CM/ECF system.

/s/ Scott M. Galante
Scott M. Galante